GEORGE F. HARDING et al.

v.

THE AMERICAN GLUCOSE COMPANY et al.

Opinion filed October 19, 1899—Rehearing denied December 19, 1899.

182  551
184  330
182  551
f96a¹⁵416
182  551
193 ¹³106
182  551
201  260
d187US651
182  551
214 ¹³277
214  ⁵449
214  ⁷453
e113a⁵605
114a ⁷ 99
114a ⁸106
114a¹³111
114a  457
114a ⁵638
182  551
215 ¹¹453

1. APPEALS AND ERRORS—Supreme Court may consider testimony though decree pro confesso was entered. Testimony taken on behalf of the complainants upon an issue of fact raised by the bill, answer and replication may be considered by the Supreme Court in passing upon the issues involved, although the answers were withdrawn and a decree pro confesso entered.

2. SAME—when error will not justify remandment. Error in sustaining a demurrer interposed by a party who has no interest in the controversy or as to whom the plaintiff consents the bill may be dismissed is not sufficient to justify a remandment of the cause for the purpose of allowing him to answer the bill.

3. PRACTICE—when bill should not be dismissed for want of equity. A bill sufficient on its face to justify the relief prayed for and sustained by proofs should not be dismissed for want of equity as to defendants, who, by their defaults, have confessed the bill.

4. BANKS—option contract to sell manufacturing plant to banking corporation is void. A banking corporation organized under the laws of Illinois has no power to purchase the plants and properties of manufacturing corporations, and option contracts providing for the sale of such properties to the bank are absolutely void.

5. TRUSTS AND COMBINES—consolidation of corporations to create monopoly constitutes a "trust." A trust is created where a majority of the stockholders in competing corporations consolidate their interests by conveying all their property to a corporation organized for the purpose of taking their property, when the necessary consequence of the combination is to control prices, limit production or suppress competition in such a way as to create a monopoly.

6. SAME—public policy of Illinois is against "trusts" and combinations creating monopolies. The public policy of the State of Illinois has always been against trusts and combinations organized for the purpose of suppressing competition and creating monopoly.

7. SAME—agreement to form illegal trust may rest upon verbal understanding. An agreement to form an illegal combination or trust need not be embodied in writing, but may rest upon a verbal understanding evidenced by the acts of the parties.

8. SAME—fact that prices may be reduced does not relieve a trust of its objectionable features. A combination or trust which has power to raise the price of an article of merchandise at any time it sees fit to do so is not relieved of its objectionable features by the fact

that it may reduce prices, since the reduction may be made for the express purpose of crushing competition.

9. SAME—*parties forming illegal trust are guilty of conspiracy.* Parties who create and enter into a combination to regulate and fix the price of a manufactured product and limit the quantity produced or sold, are guilty, under section 1 of the act of 1891, on trusts and combines, (Laws of 1891, p. 206,) of a conspiracy to defraud.

10. CORPORATIONS—*corporation cannot perform strictly corporate acts outside the State of its creation.* A corporation, as a general rule, is without power to perform corporate acts, such as the holding of a stockholders' meeting, outside of the State of its creation and where the laws under which it was incorporated have no force.

11. SAME—*stockholder has a right to hold his investment in stock.* A stockholder has a right to hold his investment in the form of stock, and a change of such investment against his consent, by a sale of the property, is a change which affects his pecuniary interests, notwithstanding he is to receive his proportion of the proceeds.

12. SAME—*stockholder may enjoin sale of corporate property to "trust."* A stockholder, to protect himself from pecuniary injury, may, on behalf of himself and other stockholders, maintain a bill to enjoin a sale and transfer of the property of the corporation engaged in a profitable business to a trust organized to suppress competition and create a monopoly, where the wrongdoers comprise the officers and a majority of the stockholders.

13. SAME—*foreign corporations in Illinois are subject to local restrictions.* Foreign corporations are subject in the State of Illinois to the same restrictions and duties as domestic corporations, and have no other or greater powers.

14. SAME—*court may restrain a foreign corporation from transferring its local real estate to a "trust."* The courts have power to restrain a foreign corporation from transferring its property within the State, and consisting largely of real estate, to another foreign corporation, in violation of laws against trusts and combines.

15. CONTRACTS—*when a contract is void as in total restraint of trade.* A contract not to manufacture or sell glucose and grape sugar or by-products within a specified territory, within which, only, they can be manufactured successfully, is an agreement in total or general restraint of trade, and void.

16. PLEADING—*demurrer is overruled by answer to same part of bill.* A defendant cannot both answer and demur to the same part of a bill, and if he does so the demurrer is overruled by the answer.

17. LIS PENDENS—*a purchaser pendente lite is bound by the decree.* A purchaser *pendente lite* is bound by the decree rendered against the person from whom he derived title.

18. WITNESSES—*witness cannot base refusal to answer on alleged immateriality of testimony called for.* A witness cannot base his refusal

to answer a question which does not involve self-crimination or privileged communication, on the ground that it calls for immaterial testimony.

19. EVIDENCE—*party's improper refusal to answer must be considered against him.* A party's refusal to answer questions solely on the ground that immaterial testimony is called for must be considered against him, the same as any other refusal to produce evidence within the power of the witness. .

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. LESLIE D. PUTERBAUGH, Judge, presiding.

This is a bill, filed on August 3, 1897, by the plaintiffs in error against the American Glucose Company, Cicero J. Hamlin, William Hamlin, Harry Hamlin, Joseph Firmenich, George Firmenich, C. H. Matthieson, F. O. Matthieson, and the officers, directors and stockholders of the American Glucose Company, and the unknown owners or holders of the option, given by the American Glucose Company for the sale of the plant in Peoria, and the unknown persons having any interest in such option . or under it.

The complainants in the bill represent, that they were the owners of 203.5 shares of the capital stock of the American Glucose Company, a corporation organized under the laws of the State of New Jersey, with its general offices in Buffalo, New York, and office situate and plant and property operated in Peoria, Illinois; that such shares of stock are represented by a certificate issued to said Harding July 1, 1885; that the Chicago Real Estate Loan and Trust Company is the equitable owner of said stock as pledgee for the security of a loan, but that said Harding is the owner thereof, subject to the rights of said pledgee; that the capital stock of the American Glucose Company is $1,500,000.00, the shares being $100.00 each, but the original issue of said stock (of which the present certificate represents the reduced issue) made the said shares of said Harding 2035 in number and of the par value of $203,500.00, instead of $20,350.00; that

Harding paid in property $203,500.00 for the original stock; that, by reason of these facts, orators became, and now are, the owners of one sixty-second part of the entire capital stock of the said American Glucose Company, if all of the stock had been issued, but about $400,000.00 of it never was issued, but is owned by the corporation itself; that the American Glucose Company .has, for many years past, been engaged in the manufacture and sale of glucose and grape sugar in Peoria; that the management during that period has been in the hands of the said Cicero J. Hamlin, late president, and his two sons, William and Harry Hamlin, and the board of directors have been and are now controlled by said Hamlin and sons; that your orators are unable to give a detailed statement of the management and administration of the affairs of the company, because the details thereof have been and are persistently, willfully and fraudulently concealed by the said Hamlins and their co-defendants from your orators; that the defendants have fraudulently manipulated and controlled the board of directors of said company, and conducted the affairs and business thereof fraudulently for their own interest and profit, and in gross disregard of the interests of your orators as stockholders, and have fraudulently paid, and still pay, enormous salaries to themselves and others in the business of said company, and, by these and other fraudulent expenditures and practices, have diverted to their own use the profits of said business, and prevented the payment to your orators of such dividends as they were entitled to receive; that, during that entire period, said Hamlins and said defendants have fraudulently controlled, and still fraudulently control, all the capital stock of said company, except that owned by your orators, and a few hundred dollars of stock owned by minority stockholders; that your orators file this bill not only in their own behalf, but also in behalf of all other stockholders similarly situated, who may see fit to come into this suit

and join therein; that said fraudulent salaries paid have been more than ten times the value of the services rendered, and said sums so diverted have amounted to the sum of $100,000.00 a year during that period, and thereby your orators have been greatly defrauded and injured.

The bill further represents that a giant pool, trust, or combine has been recently formed for the purpose of unlawfully regulating and fixing the price of glucose and grape sugar, being articles of merchandise and commodities manufactured and sold throughout the United States and in this country.

The bill further proceeds as follows: "That the names of the persons forming such pool are now unknown to your orators, who have been unable, after diligent inquiry, to ascertain the same, but they are informed and believe and charge that all said defendants are parties thereto or interested therein, with others unknown; that said pool, trust and combine is to be accomplished through and in the form of a giant corporation, with many million dollars of capital stock, formed or to be formed under the laws of the State of New Jersey; that the parties organizing, creating, promoting and managing and interested in the said pool, trust and combine have recently perfected their arrangements, contracts and agreements for the purpose of unlawfully monopolizing, controlling, regulating and fixing the price of glucose and grape sugar within the State of Illinois and the United States, and for such purpose said parties have already obtained control of the factories and plants of nearly all the corporations and individuals heretofore engaged in the manufacture and sale of said commodities in the United States; that for the purpose aforesaid the said parties organizing said pool have made overtures to the board of directors of said American Glucose Company to secure the control of the plant and property of the said American Glucose Company situated and operated in Peoria and used in the manufacture of said commodities; that said Hamlins

and said other defendants, and the directors of said company whose names are unknown, and when known will be made parties, with said other stockholders unknown, have fraudulently promised and agreed with said parties forming said pool, for the fraudulent purpose aforesaid and in violation of the statutes of Illinois, to sell and transfer and convey to said parties forming said pool, or the corporation to be used as the instrument to carry into effect the said pool, all the plant and property of the said American Glucose Company hereafter more particularly described, situated and used in the said city of Peoria, without the consent of your orators, or either of them, and without the consent of any stockholders except the fraudulent stockholders aforesaid, or said directors, except the fraudulent directors completely under the control of the said Hamlins and interested with them; that the said Hamlins and the said other defendants, and said stockholders and directors, will convey and sell and transfer said plant and property unless enjoined from so doing by the order of court, and are now planning fraudulently, wrongfully and unlawfully, in violation of the statutes, and arranging to get the authority of the stockholders fraudulently for such sale, other than your orators and independent stockholders, and in violation and fraud of your orators' rights to the premises; that the purpose and intent of the said pool and combination, and of said defendants, jointly and severally, is to create a trust in and monopoly of the said articles, and give the said corporation, trust or pool the power to regulate and fix the price of such articles in the State of Illinois and elsewhere, and to control the entire output throughout the United States, amounting now, in the aggregate, to about one and one-quarter billion pounds annually, and consuming about 40,000,000 bushels of corn annually; that said pool and combine, and the effect, intent and purpose of it, and of the said defendants severally, is in direct violation of the laws of the State and statute, and

the method of said pool and combine, and of said parties forming and using the same or interested therein, is to swallow up and merge in this pool the organizations and plants in the United States heretofore engaged in the manufacture and sale of said articles, issuing to the said organizations heretofore engaged, stock in said pool and combine or in said trust or corporation, and where this method fails, to buy such other organizations and plants for cash; that on account of being unable to deal with your orators in the favorite method above referred to, the said pool and combine, and said parties creating the same, have resorted to the second method above referred to, so far as the American Glucose Company is concerned, and now propose and intend to thus fraudulently and unlawfully obtain the property and plant of said glucose company and the title and control of it, combining and conspiring with the Hamlins and directors and stockholders, and all the other defendants in this bill, for said purposes; and the said Hamlins, and said stockholders and directors and the said defendants, are actively, and knowingly and unlawfully, participating and joining in said fraudulent intent, and preparing fraudulently and unlawfully to sell the plant and property aforesaid to the persons and parties aforesaid for the fraudulent purposes aforesaid; that your orators are informed and believe, and so charge, that said pool, and said parties promoting the same, have unlawfully and wrongfully already purchased, for the purposes aforesaid, the Chicago Sugar Refinery, consuming about 26,000 bushels of corn daily in the manufacture of said articles; and the Peoria Grape Sugar Company, consuming about 15,000 bushels; and the Rockford Sugar Works, consuming about 16,000 bushels of corn daily; and the Davenport Sugar Refinery, consuming about 9000 bushels of corn daily; and the Firmenich Manufacturing Company, consuming about 9000 bushels of corn daily, in the manufacture of said glucose and by-products, and other factories heretofore engaged

therein, all consuming more than 100,000 bushels of corn daily in said manufacture; that C. H. Matthieson is one of the men engaged in forming said trust, with F. O. Matthieson, prominently connected with the American Sugar Trust, and the said sugar trust and the said glucose trust are intended by the said parties forming the same, to work together to control and regulate the price of grape sugar and glucose and all other sugar products, and the stockholders of said new pool and combine include all the stockholders of said American Glucose Company except your orators and the owners of a few other shares, powerless to prevent said wrongful sale and transfer without the aid of this court; that after diligent inquiry your orators have not been able to ascertain the price at which the plant and property of said American Glucose Company or pool is to be so sold and transferred to said pool, although they have repeatedly applied to the officers and directors of said company to learn the same and to the said defendants to ascertain the same, and they charge that such price has been wrongfully and fraudulently agreed upon at so small a sum as to be destructive of the value of your orators' said stock; and said Hamlins, and said stockholders and directors and said defendants co-operating in the said fraudulent conspiracy, are to fraudulently receive, in addition, large sums as a bonus for such unlawful and fraudulent sale, to go to them individually, none of which will accrue to the benefit of your orators and the other stockholders of said company or to said company, and your orators, if possible, are to be frozen out and defrauded by the carrying out of said contract of sale, contrary to equity and good conscience and the statutes of this State; that there is now no occasion for the sale of the said plant and property in Peoria; that it ought not to be sold; that it is to the interest of the stockholders of said American Glucose Company, and of said company and of the public, that the said company continue to own and manage its property and plant,

and manufacture as heretofore; that such manufacture. now is, and is becoming, exceedingly profitable, and all that prevents great profits and such continuance of ownership and conduct of business is said fraudulent conspiracy of said parties above named or referred to as defendants to this bill.

"Orators charge that Joseph Firmenich, C. H. Matthieson, F. O. Matthieson, George Firmenich, George W. Lamb, secretary of the said American Glucose Company, and Thomas Grant, and the officers, directors and stockholders of said company, are fraudulently co-operating and conspiring with and aiding the said Hamlins, and so are all the other parties defendant herein, and they control more than half the entire capital stock of said American Glucose Company, and will fraudulently sell and transfer to said trust said plant and property of the said American Glucose Company, to the great wrong and injury of your orators, unless restrained by the court; that the said Hamlins and the other directors of said American Glucose Company, if said plant and property be allowed to remain under the control of said Hamlins and of said company, will wreck and destroy it, and destroy the value of your orators' stock therein; that to prevent this a receiver should be appointed for the said American Glucose Company and its property, and the business of said company carried on by such receiver, under the directions of this court, until an accounting can be had in the premises and said company re-organized under the direction of this court, and its property and business preserved for its stockholders, and such other relief granted as may be proper in the premises; that all the acts of said defendants above referred to, and of the said pool and trust interested in the same, are with the fraudulent intent to effect a combination of capital, skill, and of firms and persons, to limit and reduce the production of glucose and grape sugar, and regulate and fix and control and change, at their will,

the price of the same, and to prevent competition in the manufacture and sale, and to make contracts by which all of said parties shall bind themselves not to sell the same below its price and to keep the price at a fixed figure, so as to prevent a free and unrestricted competition, in violation of the statute of Illinois entitled 'An act to define trusts and conspiracies against trade,' etc., approved June 20, 1893, in force July 1, 1893; that all the acts of said defendants and of said pool are with the fraudulent purpose to regulate and fix the price of said commodities, to limit the amount of manufacture; that the said articles, glucose and grape sugar, are not articles of merchandise the cost of which is mainly made up in wages, and the purpose and intent of said parties, or the principal object of or the effect of their said acts, are not to maintain or increase wages, all of which is in violation of the act to provide for the punishment of persons or corporations forming pools, approved June 11, 1891, and amended in 1897; and said acts of defendants are with the intent to place the management and control of such combination and pool, and the manufactured product, in the hands of a trustee or trustees, to limit and fix the price and lessen the production and sale of said articles, and to prevent the manufacture thereof except as controlled by them, in violation of said statutes of the State of Illinois; that the legal description of the real estate on which the said plant, machinery, etc., of said American Glucose Company is situated in Peoria, Illinois, and which real estate is a part of said plant, is a part of lot numbered 6, in Frink & Sanger's extended addition to the city of Peoria, etc., situated in the southwest quarter of section 17, etc.; that the glucose business is a business of enormous proportions, to which it has recently grown; that the manufacturers thereof now produce about forty pounds out of a bushel of corn; that it is a white, mobile, sweet syrup, weighing about twelve pounds to the gallon, with many properties and uses,

daily extended, of value and importance to the health and wealth of the country; that it formerly sold it at about seven cents per pound; that its price ruled, before the formation of said trust and pool and before its plans for incorporation, as low as seventy cents per one hundred pounds; that its products were and still are used everywhere, and their commercial importance and manifold by-products are outranked in few instances; that it is an important constituent for fine table syrups and used in every household, and in making jellies and jams, confectioners' jellies and brewers' glucose, in the manufacture of leather, dyes, and many medicines and candies, and in the manufacture of beers and wines and cordials, and it is an anhydrous sugar and of universal necessity, and its by-products are used in the manufacture of paints and are substituted for olive oil, and are used for food for horses, cattle and sheep, and from the residue is produced common meal from the hulls of corn, by grinding; that these are but the beginnings of its uses daily discovered and daily extended, beginning about 1867 at fifty bushels of corn per day, and now amounting to over 100,000 bushels per day, of which 60,000 bushels per day are used at home and 40,000 bushels are exported; that great skill and vast capital are employed in said business, making competition so great that the price of glucose has gradually worked down, but good profits and great fortunes have been and are still realized therefrom, and from the manufacture, and in the purchase of the plants, said new trust proposes to further increase the profits by limiting production and regulating prices and reducing operating expenses and cost of same,—all in violation of the letter and the spirit of the statutes of Illinois, and in various ways best known to other monster trusts of the same class in other industries; that it is not an easy matter for persons or corporations to go into this business, and this new proposed organization includes plants engaged in both glucose and grape sugar,

182—36

and that it requires considerable time to erect a plant, and some of the most important processes are patented and owned by the owners of the present plants, forbidding their use in new factories, and for the further reason that it requires special skill and experienced men to erect and operate a modern glucose plant which can compete at all with these great concerns, much less with this great proposed trust, and the proper class of men to operate same is limited in number and not easily obtained, and the best men are controlled by the owners of the present plants and will be controlled by the proposed trust; that the organizers and promoters of this proposed glucose trust propose and intend to stop competition and limit production and regulate and fix prices by closing up several of the plants which they have purchased or agreed to buy; that the effect of the destruction of competition in this business is already shown in the fact the price per hundred is now $1.25, as against seventy cents per one hundred pounds two months ago, and by far the greater part of this gain of fifty-five cents was made within the few days past, and is due to the formation of this trust and to the shutting down, actual or expected, of the plants in the interest of the said trust, and the price, now nearly doubled, will still further advance, and is entirely within the control of this organization, which will control ninety-five per cent of the glucose plants of this country, and will practically destroy all competition and dictate prices; that the plants which are not yet in the new organization have agreed to fix the price as named by said proposed trust, which makes said trust absolute master of this mighty product of such vital importance to every class of men in the United States, and especially in this State, whose chief product is corn, and where many of the now competing plants to be swallowed up are situated; that the American Glucose Company is a corporation organized under the laws of New Jersey; that on inquiry from the officers of said company your

orators have learned that the president has given a cash option for the plant at Peoria, and has been informed that it has been accepted; that this option has been given to said proposed trust and that an acceptance has been given by this trust, as so stated, and that a special stockholders' meeting has been called, of which notice has been given your orators by printed notice, of which 'Exhibit A' attached is a copy, as follows, to-wit:

" 'The board of directors of the American Glucose Company, on this nineteenth day of July, 1897, declare and resolve that it is advisable that this corporation relinquish the business of manufacturing glucose and grape sugar, and such other business as it has hitherto engaged in at the city of Peoria and State of Illinois; that the nature of its business be changed accordingly; that the branch of its business at Peoria be relinquished, its manufacturing business be confined to the manufacture of starch at Buffalo, its plant and property at Peoria be sold, and that a meeting of the stockholders be called to meet in Buffalo on the third of August, 1897, at eleven o'clock, pursuant to the statute, to take action thereon.

GEORGE W. LAMB, *Sec.*'

"To this is attached, namely:

" 'You will please take notice that a meeting will be held at the office of the company in Buffalo on the third of August, 1897, for the purposes specified in such resolution.

*July 18, 1897.*                    GEORGE W. LAMB, *Sec.*'

"Your orators further show that this proposition referred to in said 'Exhibit A,' to give up the business of manufacturing glucose and grape sugar and other business in Peoria and sell its plant, indicates the mode in which this new trust has planned and intends to control the glucose business of this country, and that for that purpose it intends to absorb the business of the American Glucose Company at Peoria, Illinois; that said American plant is one of the largest of the rival manufacturing plants of the country, consuming daily 26,000 bushels of corn—nearly one-third of the total manufacture of glucose and grape sugar and ninety per cent of the glucose and grape sugar manufactured in this State; and this

option and proposed purchase, now proposed to be fraudulently ratified by the stockholders on August 3, 1897, will practically destroy all competition in the manufacture of this most useful product in the State of Illinois, and will leave the new trust omnipotent in the markets of this State and Chicago, the largest and best in the world, and will destroy the property and business of said glucose company and irreparably injure your orators.

"Your orators charge that they have not been able to ascertain at what price the said option is given, although they have applied to learn at the office of the company and to its officers, but they are informed and believe that it is a price destructive to the value of the stock, and some contract exists by which the great sacrifice of this property is to be made good at the option of certain stockholders, not including your orators nor the minority not interested in said fraudulent conspiracy, but the benefits of said sacrifice will inure to the stockholders who are stockholders of the new trust, and that a scheme is adopted, or to be adopted, by which this pretended sale will effect a sacrifice of the interests of your orators in said property, for the benefit of other people and other stockholders, which is against equity and good conscience; that the country and people are now at the bottom of the panic, but business is rapidly improving and the price for which this plant is proposed to be sold is a panic price, which sale ought not to be made, and said American Glucose Company has no call nor necessity to make such sale, and its real interests are to continue in the manufacture of glucose in the business heretofore profitable to them and which cannot be less profitable than at present, and that by retaining the plant the said American Glucose Company will enjoy the enhanced price and share in the prosperity of this and all other business about to be realized; that negotiations were begun for the creation of this trust some time ago,—precisely when cannot now be ascertained by your orators because of

the secrecy observed by those engaged in the conspiracy against the public weal,—but your orators charge that the creation was within three months past, and negotiations for the purpose of secretly forming the trust began about that time with the said American Glucose Company, the plant of which at Peoria is regarded, and is, an essential element to the creation of such monopoly, without which no such trust could profitably be formed, and that at first, and up to a late date, the negotiations and organization had taken the shape of a union of the plants above described, and were and are intended to include the plant in Peoria of said American Glucose Company; that in whatever form they may be made to appear, the real organization and substance of said glucose trust is a union of said plants embracing all plants outside of said American Glucose Company and seeking to include said company and its plant in Peoria, but that for some unknown reason, believed to be because there was some outstanding stock, such as that of your orators, which it was necessary to get up, or the parties in charge of said negotiations on the part of said American Glucose Company were unwilling to have a full share in the profits that would accrue to the American Glucose Company by such organization given to said outstanding stockholders, that its officers, secretly conducting the said negotiations, have chosen said form of sale, and chosen that the first step should be uniting in said trust an ostensible sale of said plant at Peoria to said company, for cash; that in order that the trust might go forward, a price was named by the president for said plant and was accepted by said glucose trust; and your orators allege, upon information and belief, and allege as a fact so far as concerns themselves, that such price and all the details of said negotiations have been kept secret at all times and still are kept secret, especially from your orators, who have been unable, after much inquiry, to learn the truth; that your orators allege that they are informed

and believe that options are outstanding, given by said trust as a part of this sale to said Hamlin and the other defendants to this bill, to take said stock of said trust, giving a most favorable price and an option to take said stock in lieu of cash, greatly increasing the value of the stock of said preferred stockholders; that said stock in said trust company has been listed to the amount of forty millions of dollars, as your orators are informed and believe, upon the New York Stock Exchange, of which fourteen millions are preferred stock and the remainder is common stock; that said stock is now selling, as the market reports show, at 105 cents on the dollar offered for it, but offered on the exchange to be sold only at the sum of 115 cents on the dollar; that your orators cannot learn, after much inquiry, whether the deed for said plant has been prepared or executed or delivered in escrow, nor whether the call of said meeting on August 3 for said ratification is merely a form or whether this form precedes or succeeds the sale and conveyance to said trust, but allege, upon information and belief, that the deed has not yet been delivered, although prepared, and that the possession of the plant has not yet been delivered, although ready for delivery; that a time is fixed, August 10 or earlier, for such delivery; that payment has not yet been made; that the money for such payment lies in escrow in the hands of the Illinois Trust and Savings Bank of Chicago, and with it, as claimed, said deed; that the works of said plant at Peoria prepared to deliver it, have been closed down and shut up, and that the agents, managers and officers lately in charge are now absent, the office having been removed by the said conspirators ostensibly from Peoria to Buffalo; that they are now engaged in the necessary preliminaries for the performance of said contract, as made by said president, and a part of the officers are in Peoria engaged in preparing the plant for sale and delivery by direction of said Hamlin; that if any information or notice should be given to the

officers or defendants of any opposition to said sale or as to the filing of this bill, or of any application for an injunction, immediate delivery would be made in order to defeat said injunction; that the said 203 shares of stock of your orators, originally of the par value of $203,500.00, and only cut down to avoid taxation, have cost and were of the original value to your orators of the sum of $500,-000.00; that by said sale, if carried out, the most valuable parts of the property and business of said American Glucose Company will be sacrificed, and your orators' stock will be reduced in value to less than one-twentieth of its cost, but if said property is retained and continued to be operated as heretofore, said stock, in the approaching prosperity now dawning upon the country, will enable your orators to realize a much larger per cent of the said value and re-pay the original cost of $500,000.00, instead of the pitiful sum for which, under said alleged contract and fraudulent sale, it is now being sacrificed; that said plant at Peoria consists of buildings and appurtenances admirably fitted for the purpose of manufacturing glucose and grape sugar, and in all particulars is a modern plant; that it is situated upon the south-west quarter of section 17, in township 8, range north 8, in Peoria county, Illinois, and owned by said company, as accurately described elsewhere; that some of the stockholders of the American Glucose Company who have promoted this sale to the said trust are interested as beneficiaries in the trust, and as stockholders therein, obtained by them in part by the sale to said trust of parts or the whole of other factories, and that said stockholders of said American Glucose Company, under option given or understandings with said trust, will be able to realize larger returns than those which are claimed to be dividends, out of said sale or its proceeds to accrue to your orators.

"Your orators allege, upon information and belief, that said American Glucose Company has been conducted as

a private company under charge of the said Hamlins, and its proceeds, or the proceeds of its business, have been fraudulently and wrongfully diverted to the pockets of said Hamlins in divers and sundry ways, and amongst others in payment of enormous and fraudulent salaries to themselves and others interested with them, and in payments for contracts, corn, etc., or materials made by agents or other persons representing the dominating stockholders, and an accounting ought to be had in favor of your orators with said stockholders, consisting of the Hamlins and others, and the company, to ascertain the amount of moneys which your orators charge have been so abstracted, contrary to equity, from the treasury of said company, and of dividends so wrongfully paid, and your orators ask for an order referring the case to the master for the purpose of such action.

"Your orators further show that they fear and believe, and so charge, that the contract of sale between the American Glucose Company and the new trust has been carried so far that it may be possible to claim, on the part of the contracting parties, that the contract has been executed by the delivery of the deed in escrow, in which event your orators ask the relief that the trust shall not be permitted to enter into possession or use or operate the plant, and shall not be permitted to pay, nor the American Glucose Company to receive, any further sum or take any further action in performance of the said contract, by delivery of deed or by other action; that it is part of the said contract of sale, they are advised, that the American Glucose Company shall agree not to further continue the manufacture of glucose, and shall not use their factories elsewhere which can be used for such purpose, and thus promote the said trust; that the proposition sought by said conspirators to be ratified on August 3, 1897, to relinquish the manufacture of glucose at Peoria, or elsewhere, is a part of said contract, because said American Glucose Company prefers to dispose of

their plant for cash, in form, rather than take part in the formation of a new company, and to permit them to convert their cash received into stock or otherwise, by secret agreement, exclusive of your orators, the object of such trust in acquiring said plant at Peoria being well known to them; that the transaction, as proposed to be made by said American Glucose Company and said trust, is simply a mode of union of the glucose plants of the country after the manner of the Standard Oil Company, and will constitute a grand monopoly for the purpose of controlling, regulating and fixing the price of glucose and glucose by-products, syrup, and the sugar of the country, for the entire market of Illinois and the United States; and your orators pray that the stockholders be enjoined from ratifying said transactions and sale of said plant and such relinquishment of the manufacture on the third day of August, 1897, or taking any steps to aid in the creation of said trust or any other trust, or to ratify the offer or option for the sale of said plant; that all the other stockholders of the American Glucose Company, so far as known to your orators, and certainly the great majority, consisting of the Hamlins and family, and the Firmenichs, and others of like character or associated with them, regard themselves and are interested in the consummation of this sale for a consideration unknown to your orators, and believed to be outside consideration to be paid therefor, and so they and the officers and directors of the American Glucose Company are hostile to the interests of your orators and to the true interests of the stockholders, and are desirous of carrying out said sale and to make said deed and delivery of possession under said contract of sale, and it is worse than useless to ask said company or the directors and officers to file this bill or unite in it, or take the proper steps to defeat the action of the president, as shown by said option, now proposed to be ratified on August 3, 1897; that since said offer of sale of said plant, and since said price was made and

named by president Hamlin to said trust in said option, said plant has greatly increased in value, for the value of its products has doubled; for example, since July 1, 1897, the value of glucose has increased from seventy cents per hundred pounds to $1.60 per hundred pounds, the lowest price for glucose being when said option was made and accepted; that said Hamlin had no right or power to offer said plant or to agree to the conditions of said offer, especially that the company should relinquish the manufacture of glucose and other by-products and grape sugar and withdraw from competition with said trust company, which said option contains; that the said proposed corporation of New Jersey, which is the said glucose trust aforesaid, has not, as yet, elected any president or other officers, and that said American Glucose Company is a corporation of New Jersey and incorporated under the laws thereof, although doing its business within this State, at Peoria, in the manufacture of glucose, which constitutes its main business, but its general offices, formerly at Peoria, have now been fraudulently removed to Buffalo and that said factory constituting said plant has been closed; that in some way, unknown to and concealed from your orators, the said American Glucose Company has by its officers obtained some contract, or options or understandings, permitting them to take stock in said trust company on terms that will give to them as a consideration of said plant, and so as to give them for their stock a consideration much greater than now proposed to be paid and to be given *pro rata* to your orators, for such price will only give your orators a dividend of one-twentieth of the cost of the said stock, and is a great sacrifice of your orators' interest in said property.

"To the end, therefore, that your orators may have equity in the premises, and that the American Glucose Company, Cicero J. Hamlin, William Hamlin, Harry Hamlin, Joseph Firmenich, George Firmenich, C. H. Matthieson, F. O. Matthieson, the officers, directors and stockholders

of the American Glucose Company, the unknown owners or holders of the option given by the president of the American Glucose Company for the sale of the plant in Peoria, the unknown persons having any interest in said option or under it, all of whom are made parties defendants, may be duly summoned to answer, (but not under oath, their oaths being waived,) that there may be an accounting under the order of the court, and that your orators may have decreed to them such dividends or sums as they may be found entitled to as stockholders, of said stock, and to the end that all of the said defendants and agents may be restrained and enjoined from closing up the business of manufacturing glucose and grape sugar, and such other business as said American Glucose Company has hitherto engaged in in the city of Peoria, and from changing the business and from relinquishing this branch of the business, and from carrying out in any way said option for sale or transfer of said property, or any part thereof, and from aiding or assisting any of the said acts, and from selling or transferring the said plant to any pool, trust or combine, or any association, corporation or individual, in violation of the laws of Illinois, or to any person or corporation or pool or trust or association, etc., to enable them to regulate or fix the price of glucose or grape sugar or by-products, or to fix the amount to be manufactured of same, and from any other violations of said acts of the General Assembly of Illinois approved June 11, 1891, and amended in 1897, and also act approved June 20, 1893, and that a receiver may be appointed of the said American Glucose Company to take charge of and protect and preserve its plant and property and manage same under the orders of this court, and that such injunction may be made perpetual, and to the end that your orators may have such other and further and different relief in the premises as equity may require."

This bill was sworn to, and the injunction writ was granted, as therein prayed. The summons and injunction

writ were served upon the American Glucose Company at Peoria on August 3, 1897, the day the bill was filed. Answers to the bill were at once filed by the American Glucose Company, Cicero J. Hamlin, William Hamlin, Harry Hamlin, and the officers, directors, and stockholders of the American Glucose Company (except the complainants in the bill). The solicitors for the defendants, who thus answered were, Frank D. Locke and Stevens, Horton & Abbott. On August 9, 1897, in vacation, a motion was made on behalf of the defendants, who thus answered by their solicitors, to dissolve the injunction on the answers and affidavits filed. On August 10, 1897, replications were filed by the complainants to all of said answers. On August 10, 1897, an affidavit by George F. Harding, and certain exhibits thereto were filed, and it was subsequently agreed by counsel that the said affidavit should be treated as a deposition. On the same day, August 10, 1897, the defendants, Joseph Firmenich and George Firmenich, demurred jointly and severally to the whole bill. The counsel, filing the demurrer for them, were Moran, Kraus & Mayer. On August 11, 1897, in vacation, the circuit judge dissolved the injunction; and, thereupon, counsel for the American Glucose Company, and the Hamlins and other defendants answering the bill, asked leave to file suggestion of damages. Such suggestion of damages, amounting to $7000.00, was filed on August 13, 1897. Immediately upon the dissolution of the injunction on August 11, 1897, complainants below asked and obtained leave to amend the bill, and to make new parties defendants. Thereupon, on August 13, 1897, complainants filed an amendment to their bill by inserting the following:

"Upon information and belief the plaintiffs charge that the name of said pool, trust and combine so formed or to be formed is the Glucose Sugar Refining Company, a corporation under the laws of the State of New Jersey; that the said Illinois Trust and Savings Bank is in some way

connected with it and interested in said trust and formation thereof, and in said proposed sale and transfer of said plant and property and in said option; that they, the plaintiffs, allege against the said Glucose Sugar Refining Company and the Illinois Trust and Savings Bank, and each of them, all matters and things alleged in this bill against the other defendants hereto, or either of them, and that said bank has no right or authority, under its charter, to purchase or receive title to said property or any interest therein; that said American Glucose Company has no authority or power, nor its officers, directors or stockholders, to do any corporate act, or the proposed acts referred to in said 'Exhibit A,' nor all or any or either of them, at Buffalo, New York, because the same is beyond the limits of the State chartering said company, to-wit, New Jersey. By inserting on the next page of said bill, just after the words 'acceptance thereof and each of them,' the words, 'the Glucose Sugar Refining Company, a corporation under the laws of the State of New Jersey, and the Illinois Trust and Savings Bank, a corporation under the laws of the State of Illinois,' thus making the said last two named corporations defendants to said bill. By inserting in the prayer for summons in said bill the names of defendants, the Glucose Sugar Refining Company and the Illinois Trust and Savings Bank, as above described."

The Illinois Trust and Savings Bank, made defendant to the amended bill, was served on August 19, 1897, and on September 4, 1897, entered its appearance, and filed a general demurrer to the bill by its counsel, Wilson, Moore & McIlvaine, the senior member of the firm being John P. Wilson. On October 28, 1897, the Glucose Sugar Refining Company, made defendant by the amended bill, was served with summons by the sheriff of Peoria county, and on October 29, 1897, by the sheriff of Cook county. On November 17, 1897, the Glucose Sugar Refining Company by John P. Wilson, its solicitor, and Wilson, Moore

& McIlvaine, of counsel, filed a paper purporting to be a demurrer of said defendant to a part of the amended bill and a special answer to the residue thereof. This demurrer and answer in one is as follows:

"This defendant, to so much of complainants' amended bill as charges and sets forth the formation of a pool, trust or combine for the purpose of unlawfully regulating and fixing the price of glucose and grape sugar and of acquiring and purchasing factories and plants engaged in the manufacture and sale of glucose, and as charges that the board of directors of the American Glucose Company, Cicero J. Hamlin and sons, and any other of the defendants, have promised, arranged and agreed that the parties forming and controlling the said alleged pool, trust or combine, to sell, transfer, convey and set over to them, or to the corporation which is to be used by them to accomplish their said purpose, the plant and property of the said American Glucose Company in Peoria; and to so much of said amended bill as sets forth and charges that the purpose and intention of the said pool, trust or combine, and of defendants to said amended bill, is to create a trust in and monopoly of the articles manufactured at the plant of the said American Glucose Company in Peoria, and to give the corporation of such pool, trust or combine the power to regulate and fix the price of said articles and to control the entire output thereof in the State of Illinois and elsewhere, and that the method of the parties forming said pool has been and is to swallow up and merge in itself the organizations and plants heretofore engaged in the manufacture and sale of said articles, issuing to the latter stock of said pool or in such trust corporations, and where this method fails to buy such organizations for cash; and as to so much of the said bill as relates or sets forth each and every of the charges therein contained in relation to the formation of any pool, trust or combine by the defendants thereto, or any of them, for the purpose of securing a monopoly or

limiting the output or fixing or controlling the price of glucose or any other products heretofore manufactured at the plant of the said American Glucose Company in Peoria; and as to so much of said bill as relates to the purchase by said pool, or this defendant, of any other plant or property other than that owned by the American Glucose Company at Peoria; and as to so much of the said amended bill as relates to the purposes for which the proposed purchasers of said plant contracted to purchase the said plant, and to the use which is to be made of said plant by the said purchaser; and as to so much of the said amended bill as relates to the extent and character of the glucose business and of their by-products; and as to so much of said amended bill as prays for any relief based upon said parts of said bill, this defendant demurs, and for cause of demurrer shows that plaintiffs have not made such a case as entitles them to the relief prayed for, and prays judgment of the court as to such parts of the bill; and as to the residue of the bill this defendant for answer says, it has no knowledge or information as to whether the complainants own said stock, and leaves the complainants to make proof thereof; that it has no knowledge as to the value of the stock of the American Glucose Company, or the amount of its capital stock, or the cost thereof to complainants, and therefore leaves complainants to make proof thereof, and neither admits nor denies the same; that it has no knowledge regarding the management of the affairs of the American Glucose Company or relations thereto of the defendants Cicero J., William and Harry Hamlin, nor as to salaries or dividends, and therefore neither admits nor denies the allegations touching the same, but leaves the complainants to make proof thereof as they may be advised; that this defendant is a corporation duly organized under the laws of the State of New Jersey, for the purpose of and lawfully engaged in the business of manufacturing glucose and grape sugar and other products of corn, in Illi-

nois; that by its deed bearing date August 7, 1897, the American Glucose Company conveyed to Edwin L. Johnson its plant in Peoria, which deed was delivered August 11, 1897, recorded August 12, 1897, copy attached and made a part hereof, marked 'Exhibit A;' that said Johnson, by his deed bearing date the ninth of August, 1897, conveyed to defendant said plant, deed being delivered August 11, recorded August 12, copy attached, marked 'Exhibit B;' that at the date of the delivery of said deeds it paid for the premises so conveyed, in cash; that at the date of delivery of said deeds from the American Glucose Company to Johnson, and from Johnson to this defendant, purchase price was paid in cash to the American Glucose Company, the amount paid in cash on the eleventh of August being $1,977,000.00, including personal property used with the said plant and conveyed by bill of sale to defendant by the American Glucose Company, and that immediately after delivery of said deeds defendant entered into possession of said plant and has ever since continued in possession, and has been operating said plant continuously in the manufacture of glucose and other products of corn; defendant denies that said Hamlins, or stockholders or directors or officers of the American Glucose Company, were on the thirteenth of August, 1897, or before, interested, as stockholders or otherwise, in this defendant corporation, or were interested in the organization or connected with it, or had any interest in the purchase except as stockholders and officers of said American Glucose Company; and denies that said Hamlins and other defendants, officers or directors of the American Glucose Company, have at any time confederated or conspired with any of the other defendants for the purpose of or in connection with the sale of the plant of the said American Glucose Company to this defendant, or any of the other defendants, except as officers of said glucose company; that it admits said American Glucose Company is a corporation organized

under the laws of New Jersey; that an option was given to purchase the plant at Peoria to the Illinois Trust and Savings Bank, which said option was afterwards duly assigned to Edwin L. Johnson, grantee of the deed from the American Glucose Company; admits that a special stockholders' meeting of the stockholders of the American Glucose Company was called, as alleged in said bill, but denies, on information and belief, that any option was given at any time to said Hamlins, or to any officers, directors or stockholders of the American Glucose Company, to take or receive any of the stock of this defendant at any price or upon any terms whatsoever, at any time; defendant denies, on information and belief, that any of the stockholders of the American Glucose Company have or will, directly or indirectly, receive any greater returns out of the said sale of the plant than a *pro rata* share of the price, or that any options or understandings have at any time existed between the officers or stockholders of the American Glucose Company with any other person or persons whatsoever, by means of which said officers and stockholders would derive any benefit from the said sale of said plant, other than through the distribution of the proceeds of said sale by the American Glucose Company between the stockholders, and denies that any collateral agreements have ever existed for the benefit of any stockholders in the American Glucose Company permitting them to convert their cash into stock, or otherwise participating in any benefits resulting from the sale of said plant not common to said complainants or of said stockholders; and denies that the American Glucose Company, or any of its officers, agents or directors, have at any time obtained any contract permitting them to take stock or to become interested or derive any benefits from the sale of said plant other than through the consideration paid in cash, or that they have any right to receive, or option to receive, any benefit or advantage, in any way, otherwise than through the cash con-

182—37

sideration and distribution to the stockholders; alleges that at a meeting of the stockholders of the American Glucose Company held at the city of Camden, in the State of New Jersey, on August 28, 1897, the stockholders of said corporation ratified and confirmed the action of the president and directors in selling the plant at Peoria, as hereinbefore stated, and voted to relinquish the business of manufacturing glucose and grape sugar in Peoria, and that its manufacturing business should be confined to the manufacture of starch at Buffalo, by a vote of two-thirds of the stockholders, and to reduce the capital stock from $1,500,000.00 to $150,000.00, and the stock actually issued from $1,322,500.00 to $132,250.00, and that the proceeds of the sale should be distributed among the stockholders *pro rata,* and that by an instrument signed by the owners of 12,590.4 shares of capital stock of said company out of a total number of said shares of stock outstanding of 13,225, each of said changes and action so held was ratified, and the action was duly certified to and filed with the Secretary of State of the State of New Jersey for the purpose of effecting the decrease of the capital stock and changes in the charter to said company, (a copy of which is attached as 'Exhibit C' and made a part hereof,) and by this action of said stockholders and officers the sale of said plant was duly and regularly ratified and confirmed and the changes in the charter and capital stock were regularly made, and denies that any other matter or thing in the said bill of complaint as amended, not hereinbefore demurred to or answered, is true."

"Exhibit A" referred to in the answer of the Glucose Sugar Refining Company is an indenture or deed, by which the American Glucose Company, for $1,750,000.00, warrants to Edwin L. Johnson the plant in Peoria. It is dated August 7, 1897, and recorded August 12, 1897.

"Exhibit B" to said answer of the American Glucose Company is a deed from Johnson to the Glucose Sugar

Refining Company of said plant, granting to said trust said plant in Peoria in consideration of $10.00 and other good and valuable considerations. It is dated August 9, and recorded August 12, 1897.

"Exhibit C" to said answer is a certificate of the American Glucose Company, by William Hamlin, as president, and Henry E. Grant, secretary, dated August 30, 1897, certifying that the company has reduced its authorized capital stock from $1,500,000.00 to $150,000.00, and its stock actually issued from $1,322,500.00 to $132,250.00, and has ratified the action of its stockholders at their meeting on August 3, 1897, to give up the business of glucose and such other business as it has been engaged in in Peoria, and that it has changed, accordingly, the nature of its business and given up its business in Peoria and confines its business to the manufacture of starch in Buffalo, and directed that its plant and property at Peoria be sold, and has ratified the action of the president and directors in selling the plant at Peoria to Edwin L. Johnson, of Chicago, and has authorized the distribution of the proceeds received from such sale among the stockholders, said changes having been declared by resolution of the board of directors to be advisable, and having been duly and regularly assented to by more than two-thirds of the stockholders at a meeting called by the board of directors to be held at Camden on August 28, 1897, and the written assent of said stockholders being hereto appended. This certificate was signed by the president and secretary on August 30, 1897, and to this certificate is appended a certificate by a notary public, William Johnson, that Grant swore to the above facts stated in said certificates, etc., and a certificate to this is appended of George Bingham, clerk of Erie county, New York, where said William Johnson purported to be a notary public, that Johnson was a notary public, etc., dated August 30, 1897. To this also is appended a ratification of the action by the stockholders at a meeting held on the third day

of August, 1897, declaring it advisable that the corpora-
tion relinquish the business of manufacturing glucose in
Peoria and confine itself to the manufacture of starch at
Buffalo, and that its plant and property at Peoria be sold,
and also ratify the action of the president and board of
directors in selling said property to Edwin L. Johnson,
and giving assent to each and every one of such changes
and to each and every one of the acts aforesaid, which
paper is dated August 28, 1897, and purports to be signed
by the holders of 12,590 shares of stock; and to this is
appended the certificate of the Secretary of the State
of New Jersey that the foregoing is a true copy of the
certificate of decrease of the capital stock, etc., filed in
the office on the third day of September, 1897.

Testimony was taken on behalf of the complainants
in the bill before a notary public in Chicago at various
times in the months of October and November and De-
cember, 1897, beginning on October 11, 1897, and ending
on December 17, 1897. During this period, thirteen wit-
nesses were examined on behalf of the complainants, and
John P. Wilson and John S. Stevens appeared on behalf
of defendants. In April and May, 1898, the depositions
of three witnesses were taken on behalf of the defend-
ants before a commissioner in Buffalo, New York; and
these depositions were filed in the circuit court of Peoria
county, June 1, 1898.

On June 6, 1898, the demurrers of the Illinois Trust
and Savings Bank and of Joseph Firmenich and George
Firmenich to the whole bill, and the demurrer of the Glu-
cose Sugar Refining Company to a part of the bill, were
sustained; and, thereupon, the complainants came and
abided by their bill.

On June 21, 1898, the cause came on for hearing before
the circuit judge, and it appeared that a *subpœna duces
tecum* had been served on Conrad H. Matthieson, presi-
dent of the Glucose Sugar Refining Company of New
Jersey, to appear as a witness and produce the under-

writers' agreement of the Glucose Sugar Refining Company, and the option contracts for the sale to the bank by the six corporations above named of their respective properties, and other papers and books named in said subpœna, and all letters, records, and documents touching the organization of said Glucose Sugar Refining Company; said Matthieson did not appear, and, thereupon, the complainants moved for an attachment against him; whereupon attorneys for the defendants resisted said motion. In the course of the argument on said motion, Stevens, Horton & Abbott moved for leave to withdraw the answers filed by that firm for the American Glucose Company, the Hamlins, and all the officers, directors, and stockholders of the American Glucose Company (other than complainants,) and to withdraw their appearance for said defendants. Complainants objected to this motion, but the court allowed it; and, thereupon, the following order was entered, on June 22, 1898, to which date the hearing had been adjourned from June 21, 1898, to-wit:

"Now come the parties herein by their respective solicitors, and on motion of Stevens, Horton & Abbott as solicitors for the American Glucose Company, Cicero J. Hamlin, William Hamlin, Harry Hamlin, and directors of said company and the stockholders of said company (other than defendants herein,) leave is hereby given said defendants to withdraw their answers herein, and the same being done, it is hereby ordered that the bill of complaint, as herein amended, be and the same is hereby taken as confessed by said defendants and every of them, and on motion of said attorneys, Stevens, Horton & Abbott, their appearance as solicitors for said defendants is hereby withdrawn, and the appearance of said firm is hereby entered as one of the solicitors for the defendant herein, the Glucose Sugar Refining Company."

The motion of the complainants for an attachment was then further argued, but said attorneys for defendants claimed that no evidence from said Matthieson was

then required, as the truth of the allegations of the bill was admitted by their demurrer, and by the decree *pro confesso* entered. John P. Wilson then stated to the court that the said Matthieson would attend on the next morning as a witness. Matthieson produced in court from his possession the option contracts or agreements between the Illinois Trust and Savings Bank and the Peoria Grape Sugar Company, and between the bank and the Rockford Sugar Refining Company, and between the bank and the American Preservers' Company, and between the bank and the Firmenich Manufacturing Company, but stated that the option contract with the Chicago Sugar Refining Company was not among the papers, and that he did not know where it was. Counsel for complainants offered the option contracts in evidence for the purpose of showing, that the transaction of the American Glucose Company was part of the same transaction of five other corporations, and was all one. Wilson refused to allow counsel for complainants to see the option contracts unless the court should so order, and, when the court decided that the counsel of complainants had a right to inspect the contracts, Wilson announced that he would send the books and papers out of the court room, and handed the same to his assistant, with instructions to take them from the court room. Thereupon, the court, after an inspection of the contracts by the court, decided that the contracts were not material, but held that they might be inserted in the record, and shown by the record. The court refused to allow counsel for complainants to inquire of Matthieson, the witness, what had become of the absent contract with the Chicago Sugar Refining Company. Counsel for the complainants exhibited to the witness certain copies of deeds from the Chicago Sugar Refining Company to Edwin L. Johnson, and from said Johnson to the Glucose Sugar Refining Company, dated respectively August 7 and 9, 1897, and inquired of the witness what he had had to do with the execution and delivery of

the deeds, with a view of showing the price at which the plant of the Chicago Sugar Refining Company had been sold, to-wit, $6,250,000.00, and for the purpose of showing that the sale took place as a part of the same transaction, which involved a sale of the plant of the American Glucose Company; but the court refused to allow the witness to testify upon the matters thus inquired about. Counsel for complainants also offered in evidence, with the several option contracts, certain assignments attached thereto, showing assignments of said contracts by the bank, the vendee therein, to Edwin L. Johnson; but the court refused to admit said assignments, and also refused to admit in evidence certified copies of said deeds.

The court, upon objection by Wilson that the evidence was incompetent and immaterial, refused to allow the witness, Matthieson, to state where the money came from to pay the Chicago Sugar Refining Company for its plant, or to state whether or not the money was that of the Illinois Trust and Savings Bank, or of Johnson, the grantee in the deed, or of the Glucose Sugar Refining Company; or to state how many deeds he received for the plants of the six corporations, as president of the Glucose Sugar Refining Company on August 11 and 12, 1897; or whether the transactions on August 11 and 12, 1897, with the six corporations, were carried out in his presence at the same time or not. The court, also, upon similar objections by Wilson, refused to allow the witness to state, in answer to questions by counsel for appellants, whether it was the understanding and agreement by the six corporations with the Glucose Sugar Refining Company that the conveyances and sales were to be carried out at the same time; or whether the properties were first deeded to Johnson, and then by Johnson to the Glucose Sugar Refining Company; or whether the six plants described in the option contracts are now in the possession of the Glucose Sugar Refining Company; or whether witness was in the management and control of the six corpora-

tions, as president of the Glucose Sugar Refining Company; or why the option contracts were taken to the Illinois Trust and Savings Bank for the sale of the plants of the six corporations; or whether the witness or his company fixed the price for glucose in the Chicago market, or the price at which the products of these six plants were sold in Chicago and elsewhere; or what was the price of glucose on April 1, 1897, on May 19, 1897, on June 9, 1897, on August 3, 1897; or whether the six plants in question had been competitors in the sale of glucose; or whether or not any stock of the Glucose Sugar Refining Company was used to buy either of the six plants; or whether or not the money to pay for the plant of the American Glucose Refining Company was obtained from subscriptions under the underwriters' agreement in New York; or the price at which the several plants were bought by the Glucose Sugar Refining Company; or how the price, at which the several plants as described in the several option contracts were bought, was paid, whether in money or in stock; or whether the proceeds of the underwriters' agreement were ever given to Edwin L. Johnson, or ever used by him to pay for the several plants; or whether the money paid for the American Glucose plant was received from Johnson; or what dividends had been paid by the Glucose Sugar Refining Company; or whether the Glucose Sugar Refining Company sold its glucose with reference to rebates; or whether the said company had a rebate agreement. The witness was then shown a paper over the signature of the Glucose Sugar Refining Company, dated September 23, 1897, addressed "to the trade," and stating: "You are hereby notified that on and after September 27, 1897, a rebate of one-quarter per cent per pound will be paid six months after purchase to all buyers of glucose and grape sugar, who shall comply with the terms of purchase, and who shall buy glucose and grape sugar exclusively of the Glucose Sugar Refining Company. A memorandum voucher will be furnished

each customer entitled to said rebate, and his certificate, stating that he has complied with the conditions governing said rebate, will be required." But the witness was not allowed to state whether his company had issued to the trade the paper shown to him; or to state whether, as president of the Glucose Sugar Refining Company, he had received, and had on hand out of these rebates, a sum approximating $1,000,000.00, so as to control the parties dealing in glucose, and compel them to buy of his company; or whether or not any part of the purchase price of the six plants was paid in the stock of the Glucose Sugar Refining Company, either to the corporation, or to the stockholders of the old corporation.

After hearing had upon the evidence taken, as aforesaid the court, on June 23, 1898, decreed that the bill, as amended, should be dismissed for want of equity.

The present writ of error is sued out for the purpose of reviewing the decree of the circuit court which so dismissed the amended bill for want of equity.

WILLIAM J. AMMEN, for plaintiffs in error:

Combining the management of five coal companies under one committee has been held in contravention of public policy and illegal and void. *Morris Run Coal Co.* v. *Buckley Coal Co.* 68 Pa. St. 173.

A corporation organized for controlling the manufacture and sale of matches, its object being to stifle competition and engross the whole business of the country in that line, is an unlawful combination and contrary to public policy. *Richardson* v. *Buhl*, 77 Mich. 632.

A contract by which a corporation, with others, agrees to transfer all its property to a new corporation for the purpose of controlling the selling of a certain article, is void. *Merz. Cop. Co.* v. *U. S. Cop. Co.* 67 Fed. Rep. 415.

Any combination is a monopoly the tendency of which is to prevent competition in its broad sense, and thus enhance prices. *People* v. *Sugar Refining Co.* 3 N.Y. Supp. 401.

In Illinois the legislature has declared its policy by the anti-trust and anti-monopoly statutes. It is for the court to construe these statutes as applicable to the case at bar and give effect thereto.

A combination the tendency of which is to prevent general competition and to control prices is detrimental to the public, and unlawful. Spelling on Trusts, 77.

Any contract between two or more persons or corporations affecting any article or commodity of which the public must have a sufficient supply, the tendency of which contract is the creation of a scarcity or enhancement of prices, will be held unlawful by the courts. Spelling on Trusts, 77, 76.

MORAN, KRAUS & MAYER, for defendants in error Joseph Firmenich and George Firmenich:

The bill does not show that a trust or monopoly contrary to statutory prohibitions was established or contemplated. The act of 1891 does not apply, because there was no allegation or proof of a combination to fix prices or to limit production, as is required by that act. *Coquard* v. *Linseed Oil Co.* 171 Ill. 480.

Complainants cannot attack the sale on the ground of public policy or to enforce the laws of the State. *Coquard* v. *Linseed Oil Co.* 171 Ill. 480; *Vinegar Co.* v. *Foehrenbach,* 148 N. Y. 58; *Railway Co.* v. *Steamship Co.* 86 Fed. Rep. 407; *Greer* v. *Stoller,* 77 id. 1; *Cope* v. *Fair Ass.* 99 Ill. 489; *Kerfoot* v. *People,* 41 Ill. App. 409; *World's Columbian Exposition* v. *United States,* 56 Fed. Rep. 654.

That the sale was made to an alleged trust was no ground for relief, because the sale was not an *ultra vires* act. It was expressly authorized by the statutes of New Jersey. These statutes became a part of complainant's contract as stockholder. Laws of N. J. 1896, secs. 27, 28, chap. 185; *Branch* v. *Jessup,* 106 U. S. 468; *Chicago Hansom Cab Co.* v. *Yerkes,* 141 Ill. 320; *Wallace* v. *Publishing Co.* 101 Iowa, 313; *Lauman* v. *L. & R. Co.* 30 Pa. St. 42; *Peabody* v.

*Westerly Water-works,* 37 Atl. Rep. 807; *Meredith* v. *New Jersey Zinc Co.* 55 N. J. Eq. 211.

The courts of this State will not attempt to control a foreign corporation as to a matter touching the management of its affairs or the exercise of its charter powers. Such proceeding must be instituted in the courts of the domicile of the corporation. This has been held to be the law in cases like the present. *Mining Co.* v. *Field,* 64 Md. 154; *Madden* v. *Electric Light Co.* 181 Pa. St. 617; *Leavy* v. *Columbia River Co.* 82 Fed. Rep. 775; *Gregory* v. *Railroad Co.* 40 N. J. Eq. 38; *Howell* v. *Railroad Co.* 51 Barb. 378; *Railroad Co.* v. *Railroad Co.* 131 Mass. 34.

WILSON, MOORE & McILVAINE, for defendant in error the Glucose Sugar Refining Company:

The only question before this court is whether the demurrer of the Glucose Sugar Refining Company was properly sustained. This involves only a consideration of the allegations and the law applicable thereto. No evidence was admissible in support of these allegations, to which the demurrer had been sustained. The question is one absolutely of law upon the allegations admitted by the demurrer. Morawetz on Corp. sec. 271; Pomeroy's Eq. Jur. secs. 1090, 1094, 1095; *Porter* v. *Railroad Co.* 76 Ill. 566; *Tracy* v. *Talmadge,* 114 N. Y. 162.

A stockholder can only file a bill to prevent the corporation disposing of its property upon grounds that will affect his pecuniary interests. His right to maintain such a bill grows out of its necessity to protect his property right, and to maintain it it must be shown that it is necessary to protect himself from pecuniary loss or injury. When a corporation sells its property, the only interest which a stockholder has in the sale is that the property shall be sold for a fair price and that the proceeds of the sale be divided *pro rata* among the stockholders. The stockholder does not represent the public, and cannot maintain a bill to protect the public interest or to pre-

vent a violation of law which affects him only individually.  *Cope* v. *Fair Ass.* 99 Ill. 492; *Bank* v. *Byram*, 131 id. 100; *Springer* v. *Walters*, 139 id. 422; *Hawes* v. *Oakland*, 104 U. S. 450; *Foster* v. *Mansfield*, 36 Fed. Rep. 628; *Huntington* v. *Palmer*, 104 U. S. 482; *Greenwood* v. *Railroad Co.* 105 id. 13.

Knowledge that property is intended to be used for an illegal purpose does not vitiate a sale.    *Tracy* v. *Talmadge*, 114 N. Y. 162.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The bill in this case is filed by a stockholder in the American Glucose Company, a corporation organized under the laws of New Jersey, but doing business and owning property at Peoria, in Illinois.  The stockholder, who files the bill, is a citizen of Illinois.  The American Glucose Company owned a plant, consisting of real estate together with the buildings and machinery located thereon, and also personal property, in the city of Peoria in Illinois.  The land, upon which the plant is situated, is specifically described in the bill.  The primary object of the bill, and the chief relief sought by it, are to prevent the officers and directors of the American Glucose Company from selling and disposing of its plant in Peoria, and from closing out the business, in which it is there engaged, of manufacturing glucose and grape sugar.

The bill charges, that the officers and directors of the corporation have been squandering its assets by diverting the profits made in its business to their own use; and that, in further consummation of their fraudulent disposition of the property of the company, they are about to make a sale of the manufacturing plant in Peoria to a new corporation organized under the laws of New Jersey, and to give up and abandon the business of the company as theretofore conducted in Peoria.

The bill further charges, that not only is the American Glucose Company about to make a sale of its plant

to the new corporation, but that five other corporations, engaged in the same business of manufacturing glucose and grape sugar, are about to make sales of their respective plants to the same newly organized corporation; that all of said sales constitute one transaction, and that the sale of the American Glucose Company is merely a part of that transaction.

It is charged in the bill that the arrangement, by which the proposed new corporation is to take conveyances of all these plants, constitutes a giant pool, trust, or combine, formed for the purpose of regulating, fixing, and controlling the prices of glucose and grape sugar, and of suppressing competition in the manufacture thereof, and of creating a monopoly therein.

*First*—Shortly after the filing of the bill on August 3, 1897, the American Glucose Company and William Hamlin, president thereof, and Cicero J. Hamlin and Harry Hamlin, directors and officers thereof, and all other directors and officers and stockholders thereof (except appellants), filed their answers to the bill. These answers were subsequently withdrawn, but not until June 22, 1898, while the cause was on hearing before the circuit court. Replications were filed to these answers, and an issue of fact was thus made up upon the allegations of the bill, which set up the formation of an illegal trust or combine. Upon the issue of fact as to the purchases of the plants of other corporations than the American Glucose Company with a view of forming an illegal trust and crushing out competition and creating a monopoly in the manufacture of glucose and grape sugar, testimony was taken on behalf of the complainants in the bill. We are unable to see why the consideration of the facts as developed by this testimony is not necessarily involved in the decision of this case by this court, notwithstanding the insistence by one of the counsel for defendants in error in his brief, that "no discussion of any evidence, or pretended evidence, in relation thereto is proper in this court."

It is true, that, upon the hearing of the cause, the American Glucose Company and its officers and directors and majority stockholders withdrew their answers, and permitted a default and decree *pro confesso* to be entered against them. This action on their part was a confession of the truth of all the allegations of the bill, which they had answered and put at issue. But the proof, taken in support of those allegations, was not thereby necessarily withdrawn from the consideration of the court in passing upon the issues involved in the case. Section 18 of the Chancery act provides that, "where a bill is taken for confessed, the court, before a final decree is made, if deemed requisite, may require the complainant to produce documents and witnesses to prove the allegations of his bill, or may examine him on oath or affirmation, touching the facts therein alleged. Such decree shall be made in either case as the court shall consider equitable and proper." (1 Starr & Curtis' Stat. chap. 22, p. 401). Here, the court did not require the complainants below to introduce proof to sustain the allegations of their bill, but the complainants had the right, even before issue joined, to take depositions to substantiate the averments of their bill. (*Doyle* v. *Wiley*, 15 Ill. 576). Certainly, they had a right to do so, after issue was joined. It being a matter of discretion with the court, even after default, to require proofs of the averments of the bill, it may be, that, if the complainants, on being required by the court to do so, should fail to comply, their bill might be properly dismissed for want of such proofs. But the general rule is that, where a bill is sufficient on its face to sustain the contention of the complainants therein, and to entitle them to the relief prayed for, a decree dismissing the bill for want of equity should not be entered in favor of defendants, who, by their defaults, have confessed the bill. (*Hoffman* v. *Schoyer*, 143 Ill. 598). In the present case, the court below dismissed the bill as to the defaulted defendants, as well as to the other defendants. This action

of the court was, in our opinion, erroneous, not only because the bill was sufficient to justify the relief prayed for, but because its material allegations were sustained by the proofs. This proof was clearly applicable to the actions, taken in the premises by the American Glucose Company and its officers and directors and majority stockholders, who answered the bill. Whether such proof is binding upon the Glucose Sugar Refining Company, holding from and under the American Glucose Company, will be considered hereafter.

As, therefore, the proof is before us in the record, and the case is one of great importance, we deem it our duty, before discussing the questions of law arising out of the demurrer or demurrers to the whole bill or to parts thereof, to examine the testimony upon the issue of fact made by the answers filed.

In the spring of 1897 six corporations were engaged in the manufacture of glucose, two of them in the State of Iowa, and four of them in the State of Illinois. They were the Chicago Sugar Refining Company, operating in the city of Chicago; the American Glucose Company, operating in the city of Peoria; the Peoria Grape Sugar Company, also operating in the city of Peoria; the Rockford Sugar Refining Company, operating in Rockford, Illinois; the American Preservers' Company, otherwise spoken of as the Davenport Sugar Refining Company, operating at Davenport, Iowa; and the Firmenich Manufacturing Company, operating at Marshalltown, Iowa. There was another manufactory of glucose at St. Charles, Illinois, known as the St. Charles Glucose Company, operated by one Charles Pope, of St. Charles and Chicago. Pope refused to enter the combination hereinafter mentioned at the outset, and is spoken of by some of the witnesses as an "awkward" competitor. The Pope manufactory, however, was of small capacity compared with the others. All of these corporations, thus engaged in the manufacture of glucose and grape sugar, were com-

petitors with each other in that business. The proof shows, that glucose cannot be successfully manufactured, except in what is known as the corn belt of the United States, including the States of Illinois, Iowa, Kansas, Missouri, and parts of Nebraska, South Dakota, Kentucky, and Indiana. The corn belt constitutes an ellipse of about 950 miles in length from east to west and about 700 miles in width, with Peoria as the geographical center, and all within a thousand miles of Chicago. The products of glucose are extensively used; and it is an important constituent in the matter of making table syrups, jellies, and jams, and is also used in the manufacture of beers and wines and cordials. The manufactories, as above named, consumed a little more than 100,000 bushels of corn daily in the manufacture of their products. The American Glucose Company consumed daily about 26,000 bushels of corn; the Chicago Sugar Refining Company consumed in said manufacture about 26,000 bushels of corn daily; the Peoria Grape Sugar Company, which was, however, slightly crippled by a fire consuming part of its plant, consumed therein about 15,000 bushels of corn daily; the Rockford Sugar Refining Company consumed about 16,000 bushels of corn daily; the Davenport Sugar Refining Company, or the American Preservers' Company, consumed about 9000 bushels of corn daily; and the Firmenich Manufacturing Company consumed about 9000 bushels of corn daily. The capacity of the Pope Manufacturing Company was about 6000 or 7000 bushels of corn daily.

Some time in May, 1897, as nearly as we can gather from the record, a scheme was formed for the purpose of uniting all these corporations in one ownership. The plants, including both real and personal property, so far as they were engaged in the manufacture of glucose and grape sugar, were to be transferred by these corporations respectively to a new corporation to be organized under the laws of New Jersey. Such corporation was not or-

ganized completely until August 2, 1897. Its charter,
or certificate of organization, bears date August 2, 1897,
though it would appear that it did not go into practical
operation until August 3, 1897, or shortly thereafter. The
parties, who were engaged in forming, promoting, carry-
ing out, and consummating the scheme for the consolida-
tion of the property interests of all of said corporations,
were principally the officers, directors, attorneys, and ma-
jority stockholders in the old corporations respectively.
Nearly all of them, if not all of them, were citizens of
Illinois. The principal persons engaged in forming and
consummating this consolidation, were Norman B. Ream,
and John W. Doane, who were largely interested in the
Rockford company above mentioned; William Hamlin,
the president of the American Glucose Company; Conrad
H. Matthieson of the Chicago Sugar Refining Company;
two Chicago lawyers, named John P. Wilson and Levy
Mayer, Wilson being also a stockholder in the Chicago
Sugar Refining Company; William H. Henkel, secretary
of the Illinois Trust and Savings Bank of Chicago; and
one J. B. Greenhut. Norman B. Ream was a director in
the Illinois Trust and Savings Bank of Chicago. Between
the early part of May, 1897, and August 11 or 12, 1897, all
the plants above mentioned, except that of Pope, belong-
ing to the six corporations hereinbefore described, were
transferred to the Glucose Sugar Refining Company of
New Jersey; and said plants since August 12, 1897, have
been in the possession of and operated by the Glucose
Sugar Refining Company of New Jersey. After August 7,
1897, they ceased to be operated by the respective cor-
porations theretofore owning them. As we understand
the evidence, these six corporations were, with the ex-
ception of the Pope manufactory at St. Charles, Illinois,
the only manufactories engaged in the manufacture and
sale of glucose and grape sugar within the limits of the
corn belt already described. The negotiations and trans-
actions, leading to the result thus accomplished, were

182—38

conducted secretly and with great caution. The organization of the new corporation, which was to be vested with the title to the plants, was deferred until the last moment, and was not consummated until the day before, or the day on which, the present bill was filed.

The general method, adopted for the consolidation of these properties, was substantially as follows: Option contracts were drawn up, one for each of the corporations already mentioned. By the terms of these option contracts, which were made between each of said corporations on the one part, and the Illinois Trust and Savings Bank of Chicago on the other, the corporation agreed to sell all its real and personal property and plant and leaseholds, machinery, easements, buildings, fixtures, and utensils, located at the place at which it was engaged in the manufacture of glucose, together with its good will, trade rights, trade-marks, and the right to use its patents, to the bank upon the request of the bank, or its transferee, provided such request should be made before August 15, 1897. The option contract between the Firmenich Manufacturing Company of Iowa and the Illinois Trust and Savings Bank of Chicago was dated May 24, 1897; the contract between the Rockford Sugar Refining Company, Limited, of Illinois and the bank was dated May 25, 1897; the contract between the Chicago Sugar Refining Company of Illinois and the bank, and that between the Peoria Grape Sugar Company, and the bank, were dated June 7, 1897; there are two contracts between the American Preservers' Company of West Virginia and the bank, one dated June 3, 1897, and the other dated July 19, 1897, the latter recited to be a substitute for the former; the second contract between the American Glucose Company of New Jersey and the bank was dated June 9, 1897. Some of these contracts state, that a part of the purchase money for the plant and property to be sold is to be paid in the stock of a corporation with a capital stock of $40,000,000.00 of which $14,000,000.00

is to be preferred stock, and $26,000,000.00 common stock, which said corporation is about to be organized and to acquire said property, and also the properties specified in the contracts made between the five other corporations and the bank. Some of these contracts provide, that the bank may pay for the property at its option in the stock of the new corporation to be formed, instead of cash. The contracts also contain a provision, by the terms of which the vendor corporation and its officers agree not to buy or sell or manufacture glucose, or its kindred products or by-products, for a certain term of years within a thousand miles of Chicago, the said term of years being three years in some instances, and twenty-five years in at least one instance. The defendant in error, the Glucose Sugar Refining Company of New Jersey, a corporation which was to be organized according to the terms of these option contracts, and which was finally organized as above stated, is a corporation, whose certificate of organization provides, that it shall have power to conduct business throughout the United States and all foreign countries with the object of manufacturing and selling glucose, and buying and selling corn and all its products and by-products and similar articles of merchandise, and to transport the same, and to do all lawful business incidental thereto; and said certificate further provides, that the total amount of the stock shall be $40,000,000.00 of $100.00 per share, $14,000,000.00 to be preferred stock, and $26,000,000.00 common stock, etc.

The first option contract, made between the defendant in error, the American Glucose Company, and the Illinois Trust and Savings Bank, was dated May 19, 1897. Thereby, the American Glucose Company agreed to sell to the bank its plant, etc., for $1,750,000.00, one-third in cash, and the balance to be paid by notes secured by mortgage on the property; it further provides, that "it is the purpose of the bank, or of those for whom it acts, to organize a corporation under the laws of one of the States of the

Union for the purpose of operating this plant." The contract of May 19 further provides, that an exhibit of the new corporation and its means shall be made to the president of the American Glucose Company, and then proceeds as follows: "If he (said president) be satisfied with the nature and extent of the property so owned, or if it be the property, which has been verbally stated to him will be acquired by such corporation, then $600,000.00 in amount at par of the preferred stock of such corporation, out of a total issue not exceeding $14,000,000.00, and $850,000.00 in amount at par in the common stock of such corporation, out of a total issue not exceeding $26,000,-000.00, shall be lodged with such president, and this stock shall be held as an additional collateral security for the payment of such notes and each thereof," etc. This agreement of May 19 also provides, that the bank is to purchase all the supplies and material on hand belonging to the American Glucose Company, and is to assume all the *bona fide* contracts made by the company in due course of business. It also provides, that the company and its officers and directors, including the Hamlins, shall bind themselves to the corporation not to buy or sell glucose within a thousand miles of Chicago. An unsigned copy of this contract is in the record. The contract of May 19, 1897, was not signed by the bank, and it is claimed by William Hamlin, the president of the American Glucose Company, that it was not signed by that company. We think, however, that it was signed by the American Glucose Company, as it was originally drawn. A new option contract for the sale of its property to the bank, bearing date June 9, 1897, was executed by the American Glucose Company by William H. Hamlin, its president, as a substitute, as is alleged, for the contract of May 19, 1897; and it makes the following recital in the eleventh paragraph, to-wit: "This agreement is in lieu of and in substitution for a certain other option, bearing date the 19th day of May last, *which was executed by the glucose company,*

running to the bank, and which was delivered to J. B. Greenhut," etc.

The option agreement of June 9, 1897, fixes the price of the realty of the American Glucose Company at $1,-750,000.00, and its section 6 provides, that the American Glucose Company and the Hamlins are not to make or buy or sell glucose for five years within a thousand miles of Chicago.

The agreement of June 9, 1897, is claimed by plaintiffs in error to be a contract of sale to the bank of the property of the American Glucose Company for cash, and it is contended that all the provisions for the taking of stock in the new corporation to be organized, either as purchase money, or as collateral to notes given as purchase money, were eliminated. The evidence certainly shows, that many of the officers and stockholders in the corporations, which sold their plants to the new corporation, held stock in the latter after the transfer of the plants to it. William Hamlin and Harry Hamlin both held stock in the Glucose Sugar Refining Company at a date subsequent to the delivery of the deed, which conveyed to that company the plant of the American Glucose Company. It is a fair conclusion from the testimony, that the purchases of many of the six plants were paid for, either in whole or in part, by the stock of the new company. An instance of testimony of this kind is furnished by the letter of June 21, 1897, written by Levy Mayer to William Hamlin, and Hamlin's reply thereto, dated June 22, 1897; that letter and reply are as follows:

"First, you will underwrite $500,000.00, taking $500,-000.00 preferred stock and about 143 per cent additional common, and will make a contract with a responsible party by which, in effect, you are to have the right to 'put' the amount so underwritten within a year and the other parties to have the right to 'call' that amount within the same time, the purchase price to be the amount to pay for the underwriting and six per cent additional.

This arrangement to be embodied in a contract, which shall be legally enforcible. Second, you will underwrite an additional $500,000.00 upon a basis say of 50 per cent, you to get the $500,000.00 preferred stock and about 143 per cent additional common stock, and to make a contract by which the second party is to have the right, within one year, to purchase of you this $500,000.00 so underwritten, and to receive from you the $500,000.00 preferred stock and 143 per cent common stock and to pay the price you paid therefor,—that is to say, 50 per cent, or $250,000.00, and six per cent interest thereon; you to have no right to 'put' but the other party to have the right to 'call.' All this to be embodied in a contract legally enforcible." The letter then adds, viz.: "Should what I state here be in any way different from your understanding of the facts, I shall be glad if you will send me a line putting me right."

"BUFFALO, N. Y., *June 22, 1897.*

"*Mr. Levy Mayer, 811-839 Unity Building, Chicago, Ill.:*

"DEAR SIR—Your favor of the 21st inst. is this morning received. Your understanding of my proposition to underwrite, as therein expressed, is correct in every particular. You will remember that you said on Saturday that a 'put and call' arrangement, such as I have suggested, would not be legal in Illinois, and that you did not know whether it would be in New York State or not. At this writing I have had no legal advice upon the subject. Yours very truly,    WILLIAM HAMLIN."

The letters above quoted show that, after June 9, when the last option contract of the American Glucose Company with the bank was executed by that company, Hamlin proposed to underwrite more than $1,000,000.00 of stock in the new corporation to be formed; he says that the proposition to take this stock was made on behalf of the company, and would inure to the benefit of the stockholders. But whether the plant of the American Glucose Company was paid for in cash, or in stock of the Glucose Sugar Refining Company, makes no practical difference. The purchase of the plant of the American

Glucose Company was a part of the single transaction, which involved the purchase, at one and the same time, of the plants of all the six corporations. This was well known to William Hamlin, president of the American Glucose Company. He knew, and was informed by letters from the promoters of the transaction, that they were trying to purchase or secure the property of the other five companies. He also knew that the purchase of the other properties and the organization of the new corporation would not be effected or accomplished, unless there was at the same time a transfer of the property of the American Glucose Company. The parties organizing the combination refused to consummate it, unless Hamlin would bring into the combination the property of the American Glucose Company. Money and subscriptions were secured upon the faith of the option contract executed by Hamlin for the American Glucose Company, and deposited with the Illinois Trust and Savings Bank, on account of the belief by the parties, paying such money and subscriptions, that the American Glucose Company was to be a party to the combination.

That all the corporations acted together in the matter is shown clearly by the correspondence, including the letters of the attorneys, and by the facts that the option contracts of all the companies were delivered at the same time to the same repository, to-wit, the bank, to be transferred by the bank as the promoters of the scheme should direct, and by the further fact that all the deeds, conveying the several properties to the new corporation, were executed about the same time, and delivered simultaneously.

On June 11, 1897, John P. Wilson, Levy Mayer, and J. B. Greenhut, over their own signatures, addressed and delivered to the Illinois Trust and Savings Bank of Chicago a written communication, by the terms of which they deposited with the bank the six option contracts, executed by the six corporations respectively, and by

the terms of which it was agreed to sell their respective properties to the bank; and, in said written communication, after describing the contracts, the following statements were made, to-wit: "All of the said contracts are deposited with you on the following conditions: First, you shall hold, transfer, assign, or otherwise dispose of all of the said contracts in such. way, and in such way only, as you shall be directed to do by the joint order in writing of the undersigned; second, unless you shall receive the joint order to the contrary thereof before August 16, 1897, you are authorized upon the request of said parties to said contract to surrender and deliver to said respective first parties their respective contracts." Below the signatures of Wilson, Mayer, and Greenhut, the Illinois Trust and Savings Bank, by William Henkel, its secretary, wrote the following, to-wit: "The undersigned hereby acknowledges the receipt of all the contracts mentioned in the foregoing instrument, and hereby agrees to hold said contracts subject to the conditions and provisions specified in said foregoing instrument."

The option contracts, thus deposited with the Illinois Trust and Savings Bank, remained with that bank until about August 5, 1897, or a few days thereafter. Let us see what was done in the meantime. On July 15, 1897, Levy Mayer telegraphed to William Hamlin, president of the American Glucose Company, to send abstract of title, and in his telegram added the following words: "Deal closed. Keep strictly confidential." About the same time Mayer wrote to Hamlin, acknowledging the receipt of a letter and telegram from him in regard to notice of a stockholders' meeting thereafter to be held, in which letter Mayer says: "The Davenport company, I am satisfied, for legal reasons could not be legally shut down, owing to the fact that its plant is in possession of its lessee, the Davenport Syrup Refining Company, which latter has a number of substantial contracts yet to be filled. I succeeded, however, in making very satisfac-

tory arrangement, by which it will be optional to the new company to take over outstanding contracts and to purchase undelivered produce on hand. May I trouble you to send me, as soon as possible, accurate memoranda of the improvements, and contracts for improvements, etc., which under your contract you will ask the new company to assume."

On July 17, 1897, Mayer sent to William Hamlin, president of the American Glucose Company, at Buffalo, New York, the following telegram: "Letter received. Matter has reached a point where its consummation is a certainty. It has been financed successfully and most satisfactorily, as you will agree when you learn details. If your counsel thinks stockholders' meeting necessary, please have same called to-day. A day or two is of the greatest service to me at this time. In your notice of meeting please state no more than is legally requisite. Am procuring the consent of different companies to shut down. Chicago, Peoria, Rockford, have agreed to do so at once. Firmenich has agreed to do so not later than next Saturday. Am now negotiating with Davenport in that direction. Would like you to do as we have done." To this telegram from Mayer, Hamlin sent the following telegram in reply: "We will do everything to facilitate you. Works stopped grinding Thursday on account of coal strike."

Can there be any doubt, after reading these letters and telegrams, that these parties were engaged in a scheme to have all the six corporations shut down their manufactories, and abandon their business? Can there be any doubt that Hamlin, president of the American Glucose Company, knew that the other corporations were shutting down their plants with a view to conveying them to a new corporation, and that, in transferring the plant of his own company, he was aiding the consolidation of all the properties in one giant trust? It must be remembered in this connection, that preparations were all the

time going on for the organization of the new corporation, and that this new corporation was organized on August 2 or 3, 1897, and took possession of and commenced operating all the plants of the six corporations, which had suspended business, on and after August 12, 1897. But this is not all. On July 19, 1897, the board of directors of the American Glucose Company made and passed a resolution, which is set out in full in the statement preceding this opinion, wherein it was resolved that it was advisable to relinquish the business of manufacturing glucose and grape sugar, and such other business as it was engaged in at Peoria; and wherein it was resolved that the nature of its business should be changed, and that its plant and property in Peoria should be sold, and that its manufacturing should be thereafter confined to the manufacture of starch in Buffalo; and that a meeting of stockholders should be called to take place in Buffalo on August 3, 1897; and to which resolution was attached a notice, signed by George W. Lamb, secretary, that the meeting would so be held at the office in Buffalo on August 3, 1897, for the purposes specified in the resolution. On July 23, 1897, John P. Wilson wrote the following letter to William Hamlin: "In the matter of the proposed sale of the plant of the American Glucose Company at Peoria, under the contract heretofore executed between said company and the Illinois Trust and Savings Bank, I beg leave to say that all the arrangements have been perfected by the proposed purchasers to complete the purchase and pay for the plant within the time limited by said contract. The uncertainty as to the date of closing the purchase lies in the fact that a number of properties are under contract, the purchase of all of which had to be completed simultaneously. We have not yet received the abstracts of title to some of these plants. These abstracts of title will have to be examined and the titles to all of the plants proposed to be purchased approved before the transaction can be closed, as it is a

single transaction." If this letter, written by the attorney who was most active in promoting and carrying out the scheme for the consolidation of these properties, does not show that the several purchases of all the plants were to be made simultaneously, and together constituted a single transaction, then we fail to understand the meaning of the English language.

On July 26, 1897, Mayer wrote to Hamlin as follows: "I thank you for your very kind letter of the 24th inst. I hope to be able to arrange matters so that the recent destruction by fire to one of the buildings of the Peoria Grape Sugar Company will not interfere with the pending arrangements for the purchase of its property by the new glucose company. My address in New York will be Savoy Hotel, or American Spirits Manufacturing Company, Mills Building." On the same day Mayer wrote to Hamlin in reference to the salaries to be paid by the new company to Henry E. Grant, treasurer, and George W. Lamb, secretary of the American Glucose Company, as follows: "Under existing contracts the time has arrived to determine, as I am advised, what arrangements can be made with your Messrs. Grant and Lamb. As I am told, neither Mr. Grant nor Lamb seems to be satisfied with the amounts offered, Mr. Grant suggesting that he should receive $25,000.00 a year and Mr. Lamb $10,000.00 a year. It is, however, important that the new company should, if possible, secure the services of those gentlemen mentioned at salaries not exceeding those fixed by Mr. Matthieson. It is therefore now opportune for you to undertake the office of negotiating, if possible, with Messrs. Grant and Lamb, so that contracts as contemplated can be secured from them."

On July 27, 1897, Mayer wrote to Franklin B. Locke, of Buffalo, an attorney and a director for many years of the American Glucose Company, the following letter: "You ask for the name of the grantee. That has not yet been positively determined, though it is very probable

that the name will be 'United States Glucose Company.' This matter will be determined, in all probability, some time this week, when it is expected to apply for the charter. The new company will be organized under the laws of New Jersey. It is our intention to have printed contracts uniform, as near as possible, for execution by the different officers of the vendor companies." On the same day, Locke wrote to Mayer as follows: "I now hand you draft of the little agreement promised yesterday. If satisfactory, kindly O. K. it and return it to me, so that I can have it executed upon being advised of the formation of the new corporation."

The letters thus quoted not only show that the contracts of sale to be executed by the various corporations, selling their properties, were to be uniform in their terms, but also show that the new company was to silence opposition, as well as competition, by providing places for the officers of the old companies, and by taking from them contracts not thereafter to engage in the manufacture of glucose. The above letter from Locke to Mayer refers to an agreement, under which the Hamlins stipulated not to engage in the business of manufacturing glucose for a certain number of years. This transaction is thus brought within the scathing condemnation of the Supreme Court of the United States in *United States* v. *Trans-Missouri Freight Ass.* 166 U. S. 290, where it was held not to be "for the substantial interests of the country that any one commodity should be within the sole power and subject to the sole will of one powerful combination of capital;" and where it was held to be unfortunate for the country to deprive it "of the services of a large number of small but independent dealers;" and where it was held to be "not for the real prosperity of any country that such changes should occur, which result in transferring an independent business man, the head of his establishment small though it might be, into a mere servant or agent of a corporation for selling the commodities

which he once manufactured or dealt in, having no voice in shaping the business policy of the company and bound to obey orders issued by others."

About this time, or shortly before this time, Mayer wrote a letter to Hamlin as to the insurance policies upon the property, asking for information in regard to the same, "so that, when the transfers are made to the new company, no time may be lost." He also wrote the following letter: "I want to say that I find on my return this afternoon that the matter is progressing to my entire satisfaction, and I have no doubt whatever that all the transactions can be completed unless some hitch should occur by reason of some defect in the titles, the abstracts of which are now being either brought down to date or examined. Some three have already been completed and delivered to us, and the others are being hastened forward to be completed. We are still waiting for your abstract."

On July 28, 1897, Hamlin wrote to Mayer as follows: "Mr. Grant's connection with us has given him perfect satisfaction in the past, is satisfactory to him now, and his contract insures him a comfortable living for five years to come. We are satisfied with the contract and intend to carry it out to the letter, unless, at his request, it be terminated before its natural expiration. We feel that some line of business not in competition with the new glucose company will soon be thought of by us in which Mr. Grant's knowledge and abilities will not only enable us to secure satisfactory returns, but will provide him with agreeable occupation and assure him fair pecuniary returns. The price for his services that he named to Mr. Matthieson, while very much in excess of the contract price with us, is not so unreasonable as it might seem at the first blush. In my judgment Mr. Grant is more responsible than any other individual for the condition of affairs that rendered it possible for all parties to give favorable consideration to the consolidation plan. I will

do that which I can fairly to promote his interests and those of the new company."

On July 29, 1897, John P. Wilson wrote to Locke as follows: "Will you kindly leave the name of the grantee in the contract blank for the present, and I will wire you the name of the grantee in ample time to be inserted before execution." In one of his letters written at this time, William Hamlin says: "Under Mr. Grant's management the capacity of the work was increased over fifty per cent, to 22,000 or 23,000 bushels. The increase of capacity, attended by a process that lessened the cost, enabled the American Glucose Company to produce its products and to sell them at a price that made the business, as a whole, unprofitable, in my opinion, to its competitors. We had lessened the cost of the labor and the cost of fuel, and increased the quantity and bettered the quality of the main and by-products."

On August 2, 1897, Wilson wrote to Locke as follows: "Might it not be well to keep the meeting of board of directors and stockholders alive by adjournment, so that, if any question should arise requiring action, the same might be speedily taken?"

On August 3, 1897, Mayer wrote William Hamlin as follows: "I find that during my absence all the moneys necessary to complete the purchase of the properties by the new company have been paid to the Illinois Trust and Savings Bank, and are now awaiting distribution. While east, the charter of new company was prepared, and was yesterday filed for record at Trenton, so that the new company, the Glucose Sugar Refining Company, is now in actual existence. The abstracts of title to the six properties have been furnished and have been examined. As you can well imagine, in a deal of this magnitude there are a large number of details to be looked after, as well as instruments of transfer and other contracts to be executed and delivered. These contracts must necessarily all be delivered contemporaneously. We shall be

able to begin to close the transaction this coming Thursday morning at ten o'clock, and hope to be able to conclude the entire work during that day, if possible. It is therefore necessary that all of the parties in interest should be in this city at the hour indicated." In reply to this letter, Mayer received the following telegram from Hamlin on August 4, 1897: "I will call on you at your office to-morrow morning."

On August 3, 1897, the meeting of the stockholders of the American Glucose Company was called pursuant to the notice already mentioned. At that meeting, George F. Harding, one of the plaintiffs in error and the stockholder who filed this bill, and who had theretofore written several letters to officers of the American Glucose Company, but had failed to obtain any definite or reliable information as to the proposed sale of the company's plant, made a motion that the stockholders of the company should refuse to ratify the alleged contract for the sale of the Peoria plant of the company to the glucose trust, or corporation, or its representative, upon the grounds that the sale was unlawful, as being prohibited by the statute against trusts of the State of Illinois; and that the creation of a trust in glucose by contract with the company for the purchase and sale of a necessary element in the unlawful combination by such sale was in violation of the powers of the company as given by its charter; and that the contract to relinquish the right to manufacture glucose was against both the right, interests, and powers of the company; and that the price named and made in the offer was grossly inadequate, and that it was not within the powers or duties of the president of the company to make the sale.

At this stage of the proceedings and upon this date, to-wit, August 3, 1897, the original bill in this case was filed, and an injunction was obtained. The new company, the Glucose Sugar Refining Company, had only come into existence on the day before the bill was filed. All the

proceedings, which are now to be detailed, occurred after the filing of the bill in this case, and inasmuch as the American Glucose Company was served with summons August 3, 1897, the transfers and other transactions hereinafter mentioned were made and took place *pendente lite*.

By an instrument in writing, dated August 5, 1897, signed by John P. Wilson, Levy Mayer, and J. B. Greenhut, and concurred in in writing on August 7, 1897, by Edwin L. Johnson, hereinafter named, and addressed to the Illinois Trust and Savings Bank of Chicago, the bank was designated as the party of the second part in the option contracts, heretofore referred to and made by the six corporations already named; and said communication to the bank recited, that all of said contracts had been deposited by Wilson, Mayer, and Greenhut with the bank to be held, transferred, and disposed of by it subject to their joint order; and that, in and by all said contracts, it was understood and agreed that the same might be transferred and assigned by the bank; and that, when so transferred and assigned, the said contracts respectively, and all of their respective parts or provisions, should inure to the bank, and should run in favor of, and be obligatory upon, its transferee, and be of the same purport and effect, as though such transferee had originally been made second party to the said contracts respectively; and it was further therein recited, that it was in all said contracts further provided that, in case of said transfer and assignment by the bank, all of its rights, as well as said obligations under said contracts respectively, whatever the same might be, should forthwith cease and terminate; and after such recitals the said Wilson, Mayer, and Greenhut therein requested that, pursuant to the terms of all said contracts respectively, the bank should forthwith, by proper instruction, transfer and assign all said contracts respectively to Edwin L. Johnson, of Chicago, and all of said contracts, when so transferred and assigned by it to Johnson, should inure to his benefit,

and run in favor of, and be obligatory upon him to the same purport and effect, as though he had originally been made the second party to said contracts respectively.

The Illinois Trust and Savings Bank of Chicago was a corporation, organized under the laws of Illinois for the purpose of doing a banking business, and had no power under its charter to purchase the plants and properties of corporations, engaged in the manufacture of glucose and grape sugar. Therefore, the option contracts, providing for a sale of these properties to the bank, were absolutely void. It does not appear, that the contracts were signed by the bank, but, when signed by or for the respective corporations, they were accepted and held by the bank. The bank claims that these contracts were delivered to it to hold in escrow, and that it merely acted for the parties as the repository or custodian of these contracts, subject to be disposed of as the parties might order. The proof tends to sustain the contention of the bank that it was a mere repository of the papers. It went further, however, in its assistance of these parties to carry out their scheme, than merely to act as custodian of the papers.

Attached to each contract of sale was a written assignment thereof by the bank to Edwin L. Johnson, who therein accepts the assignment, and assumes all the obligations created by the contract in favor of the bank. These written assignments, signed by the bank and Johnson, appear to have been dated August 9, 1897, except the assignment on the contract of the American Glucose Company, which was dated August 11, 1897. At least two of the contracts thus signed provided, that the proposed corporation should be organized in such State, and in such manner as should be satisfactory to John P. Wilson and Levy Mayer.

A deed, dated August 7, 1897, was executed by the American Glucose Company, by William Hamlin, its president, conveying the plant of the company in Peoria

182—39

to Edwin L. Johnson, of Chicago, for an expressed consideration of $1,750,000.00, which deed was recorded on August 12, 1897. A deed, dated August 9, 1897, was executed by Edwin L. Johnson, conveying the said plant in Peoria to the Glucose Sugar Refining Company of New Jersey for an expressed consideration of $10.00, and other good and valuable considerations, which deed was also recorded on August 12, 1897. A deed, dated August 7, 1897, was executed by the Chicago Sugar Refining Company, conveying to said Johnson its plant in Chicago and the real estate on which it was situated, for an expressed consideration of $6,250,000.00; which deed was recorded also on August 12, 1897. A deed, dated August 9, 1897, was executed by said Johnson, a bachelor of Chicago, to the Glucose Sugar Refining Company of New Jersey, conveying the same property in consideration of $10.00 and other good and valuable considerations. Other deeds were executed by the other corporations to Johnson, and by Johnson to the Glucose Sugar Refining Company. The witnesses testify, that these deeds were delivered to the Glucose Sugar Refining Company, or to C. H. Matthieson, its president, simultaneously. The deeds were delivered at the banking office of the Illinois Trust and Savings Bank on the evening of August 11, 1897, at 5:30 o'clock, which was after the regular business hours.

The injunction writ was served upon the American Glucose Company on August 3, 1897; and the injunction was in force until August 11, 1897, when it was dissolved. It will thus be observed, that the request of Wilson, Mayer, and Greenhut to the bank to assign the contracts, and the execution of the deeds by the corporations to Johnson, and by Johnson to the Glucose Sugar Refining Company, were all made and effected while the injunction was pending. The option contracts referred to, and the assignments attached thereto, were also delivered by the bank to Johnson on the evening of August 11, 1897, but these and all other papers were at once handed back

by Johnson to the bank, and placed in its vaults.  Edwin
L. Johnson above referred to was a clerk in the law office
of John P. Wilson.  He never paid a dollar for the pur-
chase of the vast properties, which were conveyed to him,
nor did he receive a dollar when he conveyed these prop-
erties to the Glucose Sugar Refining Company.  When
he signed the deeds, he did not know what he was doing;
nor did he know that any deeds were executed to him
by these various corporations; nor were any such deeds
delivered to him.  The testimony of Johnson is in the
record, and he says: "I am a clerk in Mr. Wilson's office;
*  *  *  never had any connection in any way with the
defendants;  *  *  *  never received a deed from any of
them that I know of, nor from the American Glucose Com-
pany, nor authorized any one to receive one for me; some
papers I executed; I don't know whether they were deeds
or not; I did not read the papers there;  *  *  *  I was
acting under instructions of Mr. Wilson; he did not tell
me what they were; to my knowledge I never received
any deeds."  At the taking of the testimony in this case,
Wilson made the following statement which was taken
down by the commissioner, and is in the record:  "As to
Mr. Johnson's testimony, Mr. Johnson was a clerk in my
office, and I stated to him in connection with the transfer
of the titles of the glucose property, that I should like
to have the titles taken in his name, and have him make
the conveyance to the new company; he consented, and
he signed such papers as I presented to him on my state-
ment that they were all right.  His relation was merely
acting at my request as the person through whom the
title should be conveyed, and having no part in the ne-
gotiations whatever.  He was present when the deeds
were received and delivered, and received the documents.
I am not sure whether the deeds passed into his hands,
but I think they did, and this was done in his name with
his consent.  Mr. Johnson would not be able to state the
contents of the documents, not having read them."

Henkel says, that all the papers in regard to this transaction, that came into the hands of the bank, were vouched for by Wilson and Mayer; and that, among the papers so handed to the bank and vouched for by Wilson and Mayer, was a written order, signed by Edwin L. Johnson, and endorsed as correct by Wilson and Mayer, dated Chicago, August 10, 1897, and which is in the following words: "I hand you herewith certificates for 34,500 shares of preferred stock, and 49,285¼ shares of common stock, of the Glucose Sugar Refining Company of New Jersey, with which to satisfy and cancel the receipts for money received by you under the underwriters' agreement in regard to said company, and request you to turn over and pay out all money so deposited under the underwriters' agreement as follows, namely: To the American Glucose Company of New Jersey $1,977,000.00; to the American Preservers' Company of West Virginia $700,000.00; to the Glucose Sugar Refining Company of New Jersey $773,000.00; the above amounts include two subscriptions, aggregating $75,000.00, upon which you have as yet issued no certificates." What the underwriters' agreement referred to in this order was the record does not show, as Wilson refused to allow the witnesses to testify in regard to it, and refused to allow it to be produced in evidence. That underwriters' agreement was the authority, under which the bank received the money, and gave the receipts mentioned in the order. The details in the matter were conducted and arranged with the bank by Wilson and Mayer, but, owing to the refusal of the witness to testify at the suggestion of counsel, it is impossible to state what those details were.

On the evening of August 11, 1897, the officials and representatives of the six corporations, entering into the consolidation scheme, were present at the Illinois Trust and Savings Bank; and there, upon that occasion, a delivery took place to the parties of the deeds and other documents. A check was there handed to H. E. Grant,

treasurer of the American Glucose Company, for $377,-
000.00, but not for $1,977,000.00. The amount named in
the order of August 10, to-wit, $1,977,000.00, exceeded the
consideration, to-wit, $1,750,000.00, named in the deed
of the American Glucose Company to Johnson, by $227,-
000.00. Why the amount named in the deed was thus in-
creased, or what became of the excess, does not appear.

It appears in the testimony of H. E. Grant and C. H.
Matthieson, that in the bank on the evening of August
11, 1897, there were present Matthieson and Wilson, rep-
resenting the Chicago Sugar Refining Company; Ream,
representing the Rockford company; Best and Krause,
representing the American Preservers' Company; Ed-
ward Mayer, representing the Peoria Grape Sugar Com-
pany; George Firmenich, representing the Firmenich
Manufacturing Company; and Grant, representing the
American Glucose Company. Grant says: "The deeds
were all delivered there at about the same time. I was
paid first, delivered my papers, and took my check. I
was called by Mr. Henkel, secretary of the bank. He
stood in the middle of the room, and called the American
Glucose Company. I delivered the papers, took my check,
and went out; don't know who was called next."

An agreement, dated August 11, 1897, the same day
on which the delivery of the deeds took place as above
stated, was executed between the American Glucose Com-
pany, as party of the first part, and the Glucose Sugar
Refining Company as party of the second part, which
agreement is as follows:

"Whereas, the parties hereto are engaged in the busi-
ness of manufacturing and selling glucose, grape sugar,
starch and kindred products, and the various products
of a glucose factory; and whereas, contemporaneously
herewith, the second party has purchased all the real es-
tate, leasehold, buildings, improvements, appurtenances,
easements, plant, machinery, fixtures and utensils belong-
ing to the first party, and situate in the city of Peoria,

etc.; and whereas, a valuable and substantial part of the consideration paid by the second party for the property so as aforesaid described was and is the agreement herein contained:

"Now, therefore, in consideration of the premises and of the sum of one dollar ($1.00) and other good and valuable considerations, the first party hereby covenants and agrees with the second party, its successors or assigns, that the first party shall not and will not, at any time during the period of twenty-five years from and after the date hereof, within a radius of fifteen hundred miles of the city of Chicago, Illinois, engage in the business of buying, manufacturing or selling glucose, grape sugar or any of the products now produced by any glucose factory, and the first party shall not, and will not at any time during said period of twenty-five years from and after the date hereof, use in its starch factory at Buffalo the process commonly known as the 'acid' process, which process is now in general use in glucose factories in this country."

On August 7, 1897, or about that date, the American Glucose Company assigned to Johnson its patents and policies of insurance, and its business and factories at Peoria, and all of its good will and its business, etc. On August 28, 1897, at a meeting of a majority of the stockholders of the American Glucose Company at Camden, New Jersey, that company reduced its authorized capital stock from $1,500,000.00 to $150,000.00, and its stock actually issued from $1,322,500.00 to $132,250.00, and ratified the action, taken at the other meeting on August 3, 1897, and ratified the action of the president and directors in selling the plant at Peoria to Edwin L. Johnson, of Chicago. The action, taken at Buffalo, New York, on August 3, 1897, was taken in New York by the stockholders of a New Jersey corporation. It has been recognized as a general rule by this court, that the power of a corporation to perform corporate acts outside of the State of its crea-

tion, and where the laws of its corporate existence have no force, does not exist. (*Bastian* v. *Modern Woodmen,* 166 Ill. 595). As to the attempted ratification of the alleged sale to Edwin L. Johnson, it has already been shown that there was no sale to Johnson.

*Second*—A question of law, which arises in the case, is whether the facts, set up in the bill, constitute an illegal trust. The pleadings in the case are in a somewhat singular condition. Some of the defendants answered the bill. One of the defendants to the amended bill filed a paper, which was in part an answer, and in part a demurrer. Others of the defendants demurred to the whole bill. All the demurrers, both in whole and in part, were sustained by the trial court. We are of the opinion that they should have been overruled.

A trust has usually appeared in the form of an agreement between stockholders in many corporations to place all their stock in the hands of trustees, and to receive trust certificates therefor from the trustees. But the question in the present case is, whether a trust is created where a majority of stockholders consolidate their interests by conveying all their property to a corporation, organized for the purpose of taking their property. Any combination of competing corporations for the purpose of controlling prices, or limiting production, or suppressing competition, is contrary to public policy, and is void. (2 Cook on Corporations,—4th ed.—sec. 503*a*). It makes no difference, whether the combination is effected through the instrumentality of trustees and trust certificates, or whether it is effected by creating a new corporation and conveying to it all the property of the competing corporations. The test is, whether the necessary consequence of the combination is the controlling of prices, or limiting of production, or suppressing of competition, in such a way as thereby to create a monopoly. The demurrers confess the truth of the allegations in the bill; and those allegations are, that a trust was created,

or proposed to be created, by the organization of a new corporation and the conveyance thereto of all the property owned by the six competing corporations, and the execution of agreements by the corporations, thus parting with their property, not any longer to engage in the manufacture of the industrial products in which they had been previously engaged. Six corporations were engaged in the manufacture of glucose, which can only be manufactured in a certain district or extent of country, and, with the exception of one small plant, were the only corporations engaged in such business. The allegations of the bill show, that the ability to prosecute such business was rare, and that it is difficult for new parties, not familiar with it, to engage in it. Necessarily, when corporations thus situated unite together all their properties in one new organization, and permit the latter to operate their properties, competition will be suppressed, and the new corporation will possess the power to limit production and control prices. All the competing corporations have been put out of the business by disposing of the plants, with which they conducted their business. The grantee of said corporations has no competitor in the market.

The public policy of a State is to be found in its statutes, and, when they have not directly spoken, then in the decisions of the courts, and in the constant practice of government officials. When the legislature speaks upon a subject, upon which it has the constitutional power to legislate, public policy is what the statute, passed by it, indicates. (*United States* v. *Freight Ass.* 166 U. S. 290). The public policy of the State of Illinois has always been against trusts and combinations, organized for the purpose of suppressing competition and creating monopoly.

In *Craft* v. *McConoughy*, 79 Ill. 346, we held it to be a well settled rule of law, that an agreement in general restraint of trade is contrary to public policy, and is illegal and void.

In *People ex rel.* v. *Chicago Gas Trust Co.* 130 Ill. 268, we forfeited the charter of a company, on the ground that it was formed to bring about an illegal combination; and held that an agreement, tending to prevent competition and create a monopoly, is void by the principles of the common law, because it is against public policy; and that public policy favors competition in trade, and is opposed to monopoly, as tending to advance market prices to the injury of the general public.

In *More* v. *Bennett,* 140 Ill. 69, we held again, that contracts, restraining the freedom of trade, diminishing competition, or regulating the prices of commodities, are prohibited by law; and that all combinations of capitalists and of workmen in their especial favor, by raising or reducing the prices, are so far illegal, and that agreements to combine for such purposes will not be enforced by the courts.

Again, in *Bishop* v. *American Preservers' Co.* 157 Ill. 284, we held that an agreement providing for the welding together of all the interests, engaged in a certain business, in one giant combination under the absolute dominion and control of a board of trustees, was void as contrary to public policy.

It makes no difference that the agreement for the illegal combination is not a formal written agreement. It may be a verbal agreement or understanding, or a scheme not embodied in writing, but evidenced by the action of the parties. In the present case each of six corporations, engaged in the manufacture of glucose, made a contract to sell its plant to a new corporation to be organized, and agreed not to engage in such manufacture for a term of years, and then conveyed all its property to the new corporation organized to conduct the same kind of business; and it did all this with the knowledge and understanding, that each of five other competing corporations was making the same kind of contract, and executing the same

kind of conveyance in respect to their own respective properties, all to be consummated and delivered at the same time, and under the direction and management of agents or promoters employed by all the corporations. If the transactions referred to in the bill in this case did not amount to an absolute agreement made in advance between the six corporations, they at least constituted a scheme understood by all the corporations, and participated in by them all. The carrying out of the scheme, thus understood and participated in, would necessarily result in the suppression of competition in the manufacture of glucose, and in the creation of a monopoly in that business. A part of the scheme was, that none of the six corporations or their officers should, for years, engage in the manufacture of glucose, and this feature of the scheme necessarily contemplated a wiping out of all competition in the business.

In *Distilling, etc. Co.* v. *People,* 156 Ill. 448, we held that a combination to control the manufacture and sale of all distillery products, so as to stifle competition and regulate and dictate prices, was an illegal attempt to create a monopoly, and that an organization, which has a tendency to create a trust and constitute a monopoly, is contrary to public policy and unlawful. In the latter case, it was claimed that the illegal character of the combination was removed by a change of organization, so as to have the properties of the combining distillery companies transferred directly to the new corporation organized for that purpose; but it was held that this change was formal rather than substantial, and that the same interests were controlled by the same agencies, as had controlled them under the former organization. So it is in the case at bar; the men, who control the new corporation, which was organized, to-wit, the Glucose Sugar Refining Company, are the same men, for the most part, who were interested in, and controlled some one or more of the six corporations, which disposed of their plants. Many of

the stockholders in the old corporations are holders of stock in the new corporation.

In *Distilling, etc. Co.* v. *People, supra*, this court spoke with approval of the case of *Richardson* v. *Buhl*, 77 Mich. 632; and, in the Michigan case, it appeared that the corporation, known as the Diamond Match Company, was organized to manufacture, buy, sell, and deal in friction matches, etc., and that the real object of the corporation was to buy up the property of all the corporations, or of individuals, engaged in the manufacture of friction matches, exacting from the seller in the several cases a bond that he would not for a term of years engage in, or aid any one else in, the manufacture of matches in any place where his action might conflict with the interests, or diminish the profits of the Diamond Match Company; and in that case the purposes of the company were declared to be unlawful, and it was held that any contract made to further them was void as against public policy. In *Distilling, etc. Co.* v. *People, supra*, we used, in reference to this Michigan case, the following language (p. 489): "It was held that a corporation, organized for the purpose of controlling the manufacture and sale of friction matches, and by means of which all competition was stifled, and opposition crushed, and the whole business of the country in that line engrossed by the corporation, was a menace to the public, its object and direct tendency being to prevent fair competition and to control prices; that it is no answer to say that the monopoly had in fact reduced the prices of friction matches; that such policy may have been necessary to crush competition; that the fact exists that it rests in the discretion of the corporation to raise prices at any time to an exorbitant degree; and that such combinations have frequently been condemned by courts as unlawful and against public policy."

The material consideration in the case of such combinations is, as a general thing, not that prices are raised,

but that it rests in the power and discretion of the trust or corporation, taking all the plants of the several corporations, to raise prices at any time, if it sees fit to do so.

It does not relieve the trust of its objectionable features, that it may reduce the price of the articles which it manufactures, because such reduction may be brought about for the express purpose of crushing out some competitor or competitors.

In the case at bar, however, the proof shows that, upon the completion of the new organization, and as soon as it began to operate the several plants conveyed to it, the price of glucose and its various products began to go up. One of the witnesses testifies that, in May, 1897, the price of glucose was about seventy-five cents (75 cts.) per one hundred pounds, and that, after that, it began to go up, and went as high as $1.65 per one hundred pounds.

The public policy of this State in regard to this matter is not only manifested by the decisions of the Supreme Court of the State as already referred to, but by the legislation of this State. By an act approved June 11, 1891, the legislature of Illinois enacted, that "if any corporation organized under the laws of this or any other State * * * for transacting or conducting any kind of business in this State, or any * * * individual or other association of persons whosoever, shall create, enter into, become * * * a party to any pool, trust, agreement, combination, confederation or understanding with any other corporation, * * * individual, or any other person, or association of persons, to regulate or fix the price of any article of merchandise or commodity, or shall enter into, become a member of or a party to any pool, agreement, contract, combination or confederation to fix or limit the amount or quantity of any article, commodity or merchandise to be manufactured, mined, produced or sold in this State, such corporation * * * or individual or other association of persons shall be deemed and

adjudged guilty of a conspiracy to defraud, and be subject to indictment and punishment as provided in this act." Section 2 of the act provides, that "it shall not be lawful for any corporation, * * * agent, officer or employes, or the directors or stockholders of any corporation to enter into any combination, contract or agreement with any person or persons, corporation or corporations, or with any stockholder or director thereof, the purpose and effect of which combination, contract or agreement shall be to place the management or control of such combination or combinations, or the manufactured product thereof, in the hands of any trustee, or trustees, with the intent to limit or fix the price or lessen the production and sale of any article of commerce, use or consumption, or to prevent, restrict or diminish the manufacture or output of any such article." Section 3 provides that, if a corporation or a company, firm or association shall be found guilty of a violation of the act, it shall be punished by a fine running from $500.00 to $15,000.00, according to the number of times the offense is committed. Section 4 of the act provides, that any president, manager, director, or other officer or agent or receiver of any corporation or association or any member of any company or association, or any individual, found guilty of a violation of the first section of the act, may be punished by a fine of not less than $200.00, nor to exceed $1000.00, or be punished by confinement in the county jail, not to exceed one year, or both, in the discretion of the court, etc. Section 5 of the act provides, that any contract or agreement in violation of any provision of the first four sections of the act shall be absolutely void.

This act of June 11, 1891, came under the consideration of this court in *Ford* v. *Chicago Milk Shippers' Ass.* 155 Ill. 166, and was there held to be constitutional. (Sess. Laws of Ill. p. 206).

The demurrers admit the allegations of the bill to be true. The American Glucose Company, a corporation or-

ganized under the laws of the State of New Jersey, for transacting business in Illinois, and the other persons whose names appear in the record, created and entered into a trust or combination with themselves, and with one or more of the five corporations other than the American Glucose Company, who conveyed their plants to the Glucose Sugar Refining Company, and with the Glucose Sugar Refining Company, to regulate and fix the price of glucose and grape sugar and their products and by-products; and they also entered into such combination to fix or limit the amount or quantity of glucose to be manufactured, produced, or sold in this State. These parties, therefore, under the act were guilty of a conspiracy to defraud. The testimony tends to sustain the allegations of the bill. James A. Lamon says: "The price of glucose has been within thirty or sixty days past $1.00 (per hundred pounds). * * * The price is made, as I understand it, by Pope and by the combination. As I understand it at the present time, the glucose is $1.35, I believe, and twenty-five or a quarter of a cent a hundred rebate made at the expiration of six months to the purchaser. That is by this trust or combination." L. G. Yoe testifies: "Our last purchase was made of the Glucose Sugar Refining Company on the first of this month (October or November). The price was $1.25. We were to have a rebate at the end of six months on condition of dealing exclusively with them." The evidence shows, that efforts were made to induce Pope to go into the combination and transfer his plant or manufactory to the Glucose Sugar Refining Company. When Pope was on the stand as a witness in this case, and declined, under instructions from Wilson, to state whether or not he was manufacturing glucose at all at that time, or whether he had ever sold glucose, or whether he had manufactured much glucose during the preceding two years, he stated that he had had negotiations with Wilson, and with parties claiming to represent a combina-

tion or union of factories, but declined to state what price Wilson offered him for his factory.

By the act approved June 20, 1893, in regard to trusts and combines, the legislature of Illinois enacted, "That a trust is a combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons, or of two or more of them for either, any or all of the following purposes: First, to create or carry out restrictions in trade. Second, to limit or reduce the production, or increase or reduce the price of merchandise or commodities. Third, to prevent competition in the manufacture, making, transportation, sale or purchase of merchandise, produce or commodities. Fourth, to fix at any standard or figure, whereby its price to the public shall be in any manner controlled or established, upon any article or commodity of merchandise, produce or manufacture intended for sale, use or consumption in this State; or to establish any pretended agency whereby the sale of any such article or commodity shall be covered up, and made to appear to be for the original vendor, for a like purpose or purposes, and to enable such original vendor or manufacturer to control the wholesale or retail price of any such article or commodity after the title to such article or commodity shall have passed from such vendor or manufacturer. Fifth, to make or enter into, or examine or carry out any contract, obligation or agreement of any kind or description by which they shall bind or have bound themselves not to sell, dispose of, or transport any article or commodity, or article of trade, use, merchandise, commerce or consumption below a common standard figure, or card or list price, or by which they shall agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of any article or commodity or transportation between them or themselves and others to preclude a free and unrestricted competition among themselves or

others in the sale or transportation of any such article or commodity, or by which they shall agree to pool, combine or unite any interests they may have in connection with the sale or transportation of any such article or commodity that its price might in any manner be affected." Section 2 of the act of 1893 provides, that any corporation, holding a charter under the laws of this State, which shall violate any provision of the act, shall forfeit its charter and franchise. Section 4 provides that any foreign corporation, violating any provision of the act, is thereby denied the right and prohibited from doing any business in this State. Section 5 provides, that "any violation of either or all of the provisions of section 1 of this act shall be and is hereby declared to be a conspiracy against trade, and a misdemeanor; and any person, who may be or may become engaged in any such conspiracy or take part therein or aid or advise in its commission, or who shall as principal, manager, director, agent, servant, or employee, or in any other capacity knowingly carry out any of the stipulations, purposes, prices, rates, orders thereunder or in pursuance thereof shall be punished by fine not less than $2000.00 nor more than $5000.00." Section 6 provides that, in any indictment for any offense under the act, it shall be sufficient to state the purposes and effects of combination, and that the accused was a member of, and acted in pursuance of it, without giving its name or description, etc. Section 7 provides that in prosecutions under the act it shall be sufficient to prove that a trust or combination as defined therein exists, and that the defendant belonged to it or acted for or in connection with it, without proving all the members belonging to it, or proving or producing any article of agreement or any written instrument on which it might have been based, or that it was evidenced by any written instrument at all. Section 8 provides that any contract or agreement in violation of the act shall be absolutely void and not enforceable either in law or in equity.

The bill in this case most certainly contains allegations in regard to the existence of a combination of capital and acts by two or more persons and corporations to prevent competition in the manufacture of glucose and grape sugar and their products and by-products, and to create and carry out restrictions in trade, which allegations bring the transactions referred to in the bill within the scope and meaning of section 1 of the act of 1893. Therefore, the demurrers were improperly sustained to the bill.

*Third*—Counsel for the Glucose Sugar Refining Company claim, however, that the demurrer was properly sustained to the bill, upon the ground that a stockholder has no right to file such a bill as this. The position of counsel is, that a stockholder can only file a bill to prevent the corporation from disposing of its properties, upon the ground that it will affect his pecuniary interests, and because of the necessity of protecting his property rights, and because of the necessity of protecting himself from pecuniary loss or injury; and that a stockholder in a vendor corporation has no right to enjoin a sale and transfer of a factory, owned by such vendor, upon the ground that the vendee corporation proposes to create a monopoly in the manufacture of glucose, and to use the property sold to that end, the vendor being charged to have knowledge thereof. It is said that a stockholder does not represent the public, and has no right to maintain a bill to protect the public interests, or to prevent a violation of the law against trusts and combines. This contention assumes that the creation of a trust and monopoly, as described in the bill, will work no injury to the stockholder filing the bill. In support of this contention counsel rely mainly upon the cases of *Cope* v. *District Fair Association of Flora*, 99 Ill. 489, and *Coquard* v. *National Linseed Oil Co.* 171 id. 480.

In *Cope* v. *Fair Association of Flora, supra,* the bill was filed by a stockholder in an incorporated fair association

to restrain the company and its officers from permitting, for a pecuniary reward, gamblers to congregate and ply their vocation upon the grounds of the company during its annual exhibitions; but it did not appear there from the bill or otherwise, that the complainant therein or the company had thereby sustained any pecuniary injury or loss. Here, the demurrer admits the allegations of the bill to be true, and the bill alleges that the proposed action of the American Glucose Company and its directors in disposing of its property will destroy the value of the complainants' stock therein, and will destroy the property and business of the glucose company, and irreparably injure the complainants; and that their stock will be reduced in value to less than one-twentieth of its cost. Moreover, the bill expressly refers to the acts of 1891 and 1893 above set forth; and the latter act provides for a forfeiture of the charter and franchise of any corporation violating the provisions of the act, and the dissolution of its corporate existence. It is idle to say that a stockholder in a corporation would suffer no injury from a forfeiture of its charter rights and from its dissolution. In such a case, the corporation being destroyed, his stock therein would be completely wiped out, and be made of no effect. The stockholder has a right to protest against such use of its property by the managing officers of a corporation, as will lead to such forfeiture and dissolution. But the matter complained of in the *Cope case* did not relate to any disposition of the corporate property, but related merely to a license, given by the association to outside parties permitting them to gamble. The case is not on all fours with the present case in any particular.

As to the case of *Coquard* v. *Linseed Oil Co. supra*, the main object of the bill there was to enjoin the officers of a corporation from interfering with the right of a stockholder to examine its books, etc. It would also appear that, in that case, the prayer of the bill was that the cor-

poration should be wound up, and its charter should be forfeited; and it was held that such forfeiture, for injury to the public and to its rights could only be enforced by the State. In the case at bar, the bill does not seek the forfeiture of the charter. Moreover, it was alleged there that the stockholder filing the bill had, for anything that had appeared to the contrary, participated in the illegal acts of which he complained, and for a number of years had full knowledge of the occurrences which he recited; and it was there said that his participation or *laches* of many years barred him from obtaining relief on his own account. In that case, the main ground, upon which the decision of the court was based was, that, in order to entitle himself to relief against the formation and operation of an illegal trust, the complaining stockholder must be free from participation in such illegality, and cannot take personal advantage thereof, when he has been guilty of acquiescence and long delay. The *Coquard case* is not applicable here. The bill here alleges, and the proof shows, that the dissenting stockholder, who filed the bill, vainly sought information from the officers of the American Glucose Company as to what they proposed to do in the matter of organizing a trust and disposing of its property thereto. The bill and proofs show, that the stockholder, filing this bill, attended the meeting of stockholders, held at Buffalo, August 3, 1897, for the purpose of taking action in reference to relinquishing the manufacturing of glucose and grape sugar, and selling the plant and property of the company; and that he there protested against such action on the part of the company, and presented a motion that the stockholders should refuse to ratify the offer and proposed contract for the sale of its Peoria plant. So far from acquiescing in the illegal action of the corporation, the plaintiff in error, Harding, did all that he could to defeat and prevent such action, and did this at once and without delay.

It must be remembered that, here, the pecuniary interest of the complaining stockholder was to be, and was, affected by the sale of the entire property of the American Glucose Company against his consent, and by the abandonment of its charter business against his consent, and by the utter inability of the corporation to make money or win profits, which necessarily resulted from such a sale, and from a contract not to further engage in the charter business, notwithstanding the American Glucose Company was a solvent and going concern, and doing and able to continue to do a profitable business. The shares of stock, owned by a stockholder, derive their value from the corporate property and franchise, although the stockholder's legal property in his stock is distinct from the property of the corporation. (*Porter* v. *Rockford, Rock Island and St. Louis Railroad Co.* 76 Ill. 561). If the shares derive their value from the corporate property and franchise, they will have no value practically, when all such corporate property is disposed of, and the right to carry on business is destroyed. What was here attempted was an abandonment of the business and a sale of the assets without a legal termination or dissolution of the company. It makes no difference that the stockholder is to be allowed to receive his proportionate share of the proceeds of the sale of the property. He has the right to hold his investment in the form of stock, and a change of such investment against his consent is a change which affects his pecuniary or financial interests. He has the right to be the judge, whether such a change in his pecuniary status shall be made, or whether he shall continue his investment in the form of stock.

The bill in this case recites, that the complainants therein filed it, not only in their own behalf, but in behalf of all other stockholders, who might see fit to come into the suit and join therein. Where the officers of a corporation wrongfully deal with its property to the injury of the stockholders, the latter may maintain a bill against

the company and its officers for relief against such mis-appropriation. Originally, the rule was that such a suit should be brought by the corporation itself; but equity permits a stockholder, either individually or on behalf of other stockholders similarly situated, to bring such a suit, where the corporation itself either refuses to do so, or where the facts show that the wrongdoing defendants constitute a majority of the managing body, or where it is reasonably certain that a demand made upon the proper officers of the corporation to bring the action would be unavailing. (*Green* v. *Hedenberg*, 159 Ill. 489; *Bruschke* v. *Nord Chicago Schuetzen Verein*, 145 id. 433). Here the bill alleges, and the proof shows, that the officers and directors of the American Glucose Company and the majority of its stockholders were in favor of disposing of its property to the new corporation to be formed, and that they adopted a resolution to carry out such action against the protest of Harding. Therefore, no previous demand upon the managing officers to bring this suit would have been availing. It follows, however, that, where the bill in such case is filed by the stockholder, the final relief, when obtained, belongs to the corporation and all its stockholders, and not alone to the stockholder complaining. In view of this fact, Pomeroy in his work on Equity Jurisprudence, (sec. 1095,) says: "This view completely answers the objection, which is sometimes raised in suits of this class, that the plaintiff has no interest in the subject matter of the controversy nor in the relief. In fact, the plaintiff has no such direct interest; the defendant corporation alone has any direct interest; the plaintiff is permitted, notwithstanding his want of interest, to maintain the action solely to prevent an otherwise complete failure of justice." Morawetz, in his work on Private Corporations, (sec. 271,) says: "A corporation and its shareholders are identical. * * * Obviously, then, any injury to a corporation must be an injury to its shareholders; and it follows, that, subject to the limitations that have

been pointed out, a shareholder is entitled to relief in equity on account of any wrong constituting an infringement of the corporate rights."

The views above expressed are abundantly sustained by authority. In *Stewart* v. *Erie and Western Transportation Co.* 17 Minn. 372, the Supreme Court of Minnesota said: "We agree with the plaintiff's counsel, and with the cases by him cited, that it is against the general policy of the law to destroy or interfere with free competition. * * * An unauthorized monopoly, is, therefore, against public policy as destroying and interfering with free competition. * * * If a corporation is employing its statutory powers, funds, etc., for purposes not within the scope of its institution, a court of equity will, upon the application of a single dissentient stockholder, interfere by injunction. * * * The right of a stockholder to this interference seems to be placed upon the ground that, from the fact that the corporation was created for certain purposes, there is an implied contract that it shall not divert its powers or funds to other purposes, and that such diversion would be a species of breach of trust as well as a violation of law, which might endanger the existence of its charter. But it is to a dissentient stockholder that the relief is granted, and to a stockholder who comes with diligence to assert his rights. * * * There is no good reason, of which we can conceive, why the plaintiff's right to maintain this action should stand upon any different footing because the contract provides for a monopoly, or because it is simply *ultra vires.* In either case, the contract is illegal. * * * Defendant's objection, that the complaint does not state a cause of action, because no facts are alleged going to show that he will suffer any pecuniary damage in consequence of the contract complained of, is not well taken, not only because the complaint alleges that the effect of the contract, if carried out, will be to render plaintiff's stock worthless, but because if the contract is illegal, as

alleged, it may lead to a total forfeiture of the charter of the company in which plaintiff is a stockholder."

In *Small* v. *Minneapolis Electro-Matrix Co.* 45 Minn. 264, the court said: "We need not inquire how far, or under what circumstances, considerations of public policy and of the general interests of the State may affect the right of a corporation to discontinue the business, for which it was created, and to surrender to another corporation its property and the conduct of such business. We do decide, that such a surrender of the property, and, so far as possible, of the functions of a corporation, in order that, while it is to still continue in existence, its business may be carried on by another corporation, to which such transfer is made, would violate the rights of a non-assenting stockholder, arising from the contract implied, if not expressed, in the creation of such an organization; and he would be entitled to have such acts restrained by injunction." (See, also, *Abbott* v. *American Hard Rubber Co.* 33 Barb. 578; *People* v. *Ballard,* 134 N. Y. 269).

In the fourth edition of Cook on Corporations (secs. 669, 670), it is said: "That a charter constitutes a contract between the corporation and its stockholders is a principle of law that has become firmly imbedded in the jurisprudence of modern times. * * * Any act or proposed act of the corporation, or of the directors, or of a majority of the stockholders, which is not within the expressed or implied powers of the charter of incorporation, or of association—in other words, any *ultra vires* act —is a breach of the contract between the corporation and each one of its stockholders, and consequently any one or more of the stockholders may object thereto, and compel the corporation to observe the terms of the contract as set forth in the charter. * * * Ever since the case of *Abbott* v. *American Hard Rubber Co.* 33 Barb. 578, the law has been clearly established in this country, that a dissenting stockholder may prevent the sale of all the corporate property by the directors, or by a majority of the

stockholders, where the corporation is a solvent, going concern. And even where a dissolution is the purpose in view, yet, if the corporation is a prosperous one, such a sale cannot be made. If the purpose of such dissolution is not the *bona fide* discontinuance of the business, but is the continuance of that business by another new corporation, then the rule is that a dissenting stockholder may prevent the sale, even though it is. made with a view to dissolution of the corporation.   *   *   *   Such a dissolution is practically a fraud on dissenting stockholders. It seeks to do indirectly what cannot legally be done directly."

The allegations of the bill in this case, as well as the answer of the Glucose Sugar Refining Company, and the testimony taken in the case show, that the property of the American Glucose Company was passed over to a new corporation, to-wit, the Glucose Sugar Refining Company; and that the latter company was to continue the business, theretofore prosecuted by the American Glucose Company, which was a solvent concern and doing a profitable business. There is no reason why the American Glucose Company should not have continued to prosecute its own business, instead of turning it over to be prosecuted by a new corporation, unless the officers, directors, and stockholders, making the transfer to the new corporation, expected, by suppressing competition, to fix and control prices, and thereby increase their own profits to the injury of the consumers of the manufactured products and of the public generally. It must be remembered, that these transfers of properties were not made by the six corporations to a corporation already existing and doing business, but a new corporation was to be created, and was created, for the express purpose of taking and using the properties to be conveyed to it. All the arrangements for the several transfers were made before the new corporation was allowed to come into existence. The only purpose of its existence was to take and use, in

a consolidated form, all the plants of the six old corpora-
tions.    The illegal trust or combination was formed, not
after the making of the sales, but by the sales themselves.

The contention of counsel for the Glucose Sugar Re-
fining Company, that the American Glucose Company
had a right to make a sale of its plant to the new corpo-
ration, and that this transaction must be regarded by the
court merely as a valid sale, is not supported by the al-
legations of the pleadings, or by the proofs herein.    The
transfer of its property, made by the American Glucose
Company, was a transfer to a corporation, created for the
express purpose of taking its property and the property
of other corporations, so as to use them in the suppres-
sion of competition, and in the creation of a monopoly in
the manufacture of glucose, and grape sugar, and their
products and by-products.    The whole scheme, as devised
and consummated, was a fraud not only on the public,
but upon the dissenting stockholder filing this bill.    We
are, therefore, of the opinion that the bill was not de-
murrable because brought by a stockholder, and that the
court below erred in sustaining the demurrer, if it was
sustained upon that ground alone.

*Fourth*—It is claimed by counsel that, inasmuch as
the American Glucose Company is a corporation organ-
ized under the laws of the State of New Jersey, this bill
will not lie.    Counsel for defendants below introduced in
evidence sections from 6 to 32 of an act of the legislature
of New Jersey concerning corporations, passed in 1896,
after the American Glucose Company was incorporated,
which was in 1883.    Section 27 of the act in question pro-
vides, that every corporation organized under that act
may change the nature of its business, increase and de-
crease its capital stock, etc., in the manner provided for
in that section.    Section 28 of the act provides, that any
corporation, whether organized under a special act of
incorporation, or under general laws, with certain excep-
tions, may relinquish one or more branches of its busi-

ness. It is claimed, that, under said sections 27 and 28, the American Glucose Company was authorized, under the laws of the State which gave it its charter, to do the acts which have been heretofore referred to and set forth; and that, by reason of its being a foreign corporation, this State cannot entertain a bill, which seeks to inquire into the manner, in which its directors manage its affairs and exercise its charter powers. The bill alleges, and the proof shows, that the American Glucose Company owned a plant, consisting of real estate and buildings thereon together with the machinery, fixtures, etc., therein, situated in the city of Peoria in this State, and that it operated said plant in this State, and therewith conducted the business of manufacturing glucose and grape sugar. Being a foreign corporation, thus owning property and doing business in this State, it is subject to the same regulations and restrictions, which apply to corporations organized under a charter granted by the State of Illinois. Section 26 of the Illinois act in regard to corporations, provides, that "foreign corporations and the officers and agents thereof, doing business in this State, shall be subjected to all the liabilities, restrictions, and duties that are or may be imposed upon corporations of like character, organized under the general laws of this State, and shall have no other or greater powers. And no foreign or domestic corporation, established or maintained in any way for the pecuniary profit of its stockholders or members, shall purchase or hold real estate in this State, except as provided for in this act." Section 5 of the Illinois act in regard to corporations provides, that corporations, formed thereunder, "may own, possess and enjoy so much real and personal estate as shall be necessary for the transaction of their business, and may sell and dispose of the same when not required for the uses of the corporation." As foreign corporations and their officers and agents, doing business in this State, are subject to the liabilities and restrictions of domestic cor-

porations of like character, and as domestic corporations
are allowed to sell and dispose of the real and personal
property used by them for the transaction of their busi-
ness, when not required for the uses of the corporation,
it follows that foreign corporations may sell and dispose
of the real and personal estate necessary for the transac-
tion of their business, when the same is not required for
the uses of the corporation. There is no allegation in the
pleadings in this case, and no testimony tending to prove,
that the property of the American Glucose·Company at
Peoria was not required for the uses of that company. On
the contrary, the proof tends to show that the property
was required by the company for the business there con-
ducted. As has already been stated, the company was in
a solvent condition, and was doing a prosperous business;
the disposition made of its property to a gigantic trust
with a capital stock of $40,000,000.00, was such a dispo-
sition as was not authorized by the statute. The act of
1891, which has already been set forth, applies to foreign
corporations as well as to domestic corporations; and
the act of 1893 above set forth, by providing in section 44
that every foreign corporation, violating any provision
of that act, shall be denied the right to do business with-
in this State, impliedly requires the obedience of all for-
eign corporations, doing business in this State, to the
provisions of that act.

It is the settled doctrine of this State, established by
many decisions of this court, that foreign corporations
do not come into this State as a matter of legal right,
but only by comity, and that said corporations are sub-
ject to the same restrictions and duties as corporations
formed in this State, and have no other or greater powers.
(*Hazelton Boiler Co.* v. *Tripod Boiler Co.* 142 Ill. 494; *Pennsyl-
vania Co. for Insurance on Lives* v. *Bauerle,* 143 id. 459; *Bishop*
v. *American Preservers' Co.* 157 id. 284; *Farmers' Loan Co.* v.
*Elevated Railroad Co.* 173 id. 439; *Freie* v. *Fidelity Building
Union,* 166 id. 128; *Rhodes* v. *Missouri Savings Co.* 173 id.

621). In *Distilling, etc. Co.* v. *People*, 156 Ill. 448, where the defendant corporation was organized to monopolize the business of manufacturing and selling all distillery products, and the various plants and properties used in that business were transferred to the defendant corporation, we said (p. 491): "The defendant is authorized to own such property as is necessary for carrying on its distillery business, and no more. Its power to acquire and hold property is limited to that purpose, and it has no power, by its charter, to enter upon a scheme of getting into its hands and under its control all, or substantially all, the distillery plants and the distillery business of the country for the purpose of controlling production and prices, of crushing out competition, and of establishing a virtual monopoly in that business. Such purposes are foreign to the powers granted by the charter. Acquisitions of property to such extent and for such purpose do not come within the authority to own the property necessary for the purpose of carrying on a general distillery business." This language applies both to the American Glucose Company and to the Glucose Sugar Refining Company. Foreign corporations cannot be permitted to come into this State for the purpose of asserting rights in contravention of our laws. (*Hazelton Boiler Co.* v. *Tripod Boiler Co. supra*).

In *Pope* v. *Hanke*, 155 Ill. 617, it was held, that comity between different States does not require a law of one State to be executed in another when it will be against the public policy of the latter State; that no State is bound to recognize or enforce contracts which are injurious to the welfare of its people, or which are in violation of its own laws; and that a contract made in one State will not be enforced in another when, to do so, would contravene the criminal laws of the latter State, or would be against the express prohibition of its laws. This same doctrine was also announced in *Rhodes* v. *Missouri Savings Co. supra.*

The proof shows, that nearly all the parties, organizing and engineering the illegal combination known as the Glucose Sugar Refining Company, were citizens of Illinois; and that four of the corporations, which transferred their property to the Glucose Sugar Refining Company, were operating their plants in Illinois at Peoria, Rockford and Chicago. Citizens of Illinois cannot evade the laws of Illinois passed against trusts and combines, and defy the public policy of the State by going into a foreign State, and chartering a corporation to do business in this State in violation of its laws. When these foreign corporations come into this State to do business, they must conform to the laws and public policy of this State. Moreover, the property transferred to Johnson, and through him to the Glucose Sugar Refining Company, consisted largely of real estate, located in Illinois, and nothing is better settled than that the validity of all transactions relating to land depends upon the laws of the State where the land is situated. (*Wunderle* v. *Wunderle*, 144 Ill. 40). If real estate in Illinois, owned by domestic corporations, cannot be used for the purpose of carrying out the business of an illegal trust or combination, real estate in Illinois, owned by a foreign corporation, cannot be used for such a purpose.

We are, therefore, of the opinion that the fact, that the American Glucose Company and the Glucose Sugar Refining Company were foreign corporations, does not militate against the power of the courts in this State to grant relief under such a bill as is filed in this case.

*Fifth*—One of the features of the transaction, by which the property of the American Glucose Company was taken from it, is the contract entered into on August 11, 1897, between that company and the Glucose Sugar Refining Company. This contract indicates clearly, that the object of the whole scheme was to suppress competition in the manufacture of the products referred to, and to create a monopoly therein. By the terms of that

agreement, the American Glucose Company agreed, that it would not, at any time during the period of twenty-five years from that date, within a radius of fifteen hundred miles of Chicago, engage in the business of buying, manufacturing, or selling glucose, grape sugar, or any of the products produced by any glucose factory; and it was therein recited, that the agreement so to refrain from engaging in such business for the period named was a part of the consideration paid by the Glucose Sugar Refining Company for the purchase of the property of the American Glucose Company. Contracts in total restraint of trade are void; but contracts in restraint of trade are valid, and will be enforced, where the restraint is reasonable, partial, and founded upon a good consideration. In other words, all contracts made in general restraint of trade are void. A contract to refrain from trade throughout an entire State has been held to be general and illegal, while limitation to a particular place is allowable. It has, however, been held that some callings would be treated as being under general restraint, if inhibited by contract throughout the State, while others would not. (3 Am. & Eng. Ency. of Law, p. 882; 9 id. pp. 884-888). Where a contract in restraint of trade is general not to pursue one's trade at all, or not to pursue it in the entire realm or country, the contract is clearly against public policy, and as such is void. (Beach on Monopolies and Industrial Trusts, p. 114, sec. 37). In *Hursen* v. *Gavin*, 162 Ill. 377, we said: "Undoubtedly, contracts in total restraint of trade are void. * * * A contract in restraint is thus total and general, when, by it, a party binds himself not to carry on his trade or business at all, or not to pursue it within the limits of a particular country or State."

The evidence shows, that the manufacture of glucose and grape sugar and their products is confined to a certain "corn belt," where corn is raised, and that this district is embraced within the territory specified in the

contract of August 11, 1897; that is to say, within a radius of fifteen hundred miles of Chicago. As the evidence in this record tends to show that glucose can only be manufactured successfully within this radius, the agreement not to manufacture and sell it therein amounted, in effect, to an agreement in total or general restraint of trade; hence, the agreement was void, and stamps the transaction, of which it was a part, as illegal.

*Sixth*—The question arises what is the proper judgment to be rendered by this court in this case. As has already been stated, the Glucose Sugar Refining Company filed a demurrer to a part of the bill and an answer to a part. The demurrer was directed against such parts of the bill, as alleged the sale of the property of the American Glucose Company to be a part of one general transaction, which involved the sales of the properties of five other corporations. The answer purports to be directed to those parts of the bill, which specify other features of the transfer of the property of the American Glucose Company outside of the connection of such transfer with the other transfers in question. The main relief sought by the bill is the setting aside of the transfer of the property of the American Glucose Company. It matters not that such transfer is sought to be set aside on several grounds. The relief is the same whatever ground may be relied upon. The answer sets up the fact, that the American Glucose Company is a corporation organized under the laws of New Jersey for the purpose of engaging in the business of manufacturing glucose, etc., and other products of corn in Illinois; it then proceeds to set up the execution of the deeds of the American Glucose Company to Johnson, and of Johnson to the Glucose Sugar Refining Company; and it then alleges, that the latter company paid cash for the premises at the date of the delivery of said deeds. The bill had alleged, that the method of the pool or combination was to swallow up or merge therein the plants engaged in such business in

the United States by issuing to the several corporations, theretofore operating that business, stock in the said pool or combine or in said trust or corporation; and, that where this method failed, its method was to buy such other organizations and plants for cash. The buying of some of the plants for cash when it was necessary, was a part of the method of carrying out the pool or combination. The demurrer, being directed to such parts of the bill as had reference to the formation of the pool or combination, was necessarily directed to those parts which alleged the payment of cash as a method of carrying it out, as well as to those parts which alleged the taking of stock in the new corporation, as the method of securing the properties to be purchased. Hence, the answer was directed to the same part of the bill to which the demurrer was directed. Again, the answer sets up facts, showing that the American Glucose Company relinquished its manufacturing business at Peoria, and transferred its property, through the deeds to Johnson, to a new corporation, organized in New Jersey to do the same business in Illinois, which the American Glucose Company had theretofore done in Illinois. In other words, the answer sets up facts, showing that the American Glucose Company discontinued the business, for which it was created, and surrendered to another corporation its property and the conduct of such business, without alleging in any way that the American Glucose Company was insolvent, or that it was necessary for it so to transfer its business and property. The effect of such transfer was to lessen the number of corporations engaged in the business of manufacturing glucose, because the answer treats the Glucose Sugar Refining Company as an already existing corporation, engaged in the business when the transfer to it was made. If this was so, the American Glucose Company, without cause, suppressed competition in the business to the extent stated. This part of the answer, therefore, was directed to the allegations in re-

gard to the formation of a trust set forth in the bill, and was, therefore, directed to the same part of the bill which was demurred to. Again, the bill was charged by the Glucose Sugar Refining Company to be demurrable upon the ground that it was filed by a stockholder; and the reason, why it is urged that a stockholder cannot file a bill, is, that a stockholder cannot enjoin the sale of the property of a corporation upon the ground that the purchaser intends to violate the criminal law of the State. The answer, however, proceeds to reply to the bill as though it was properly in court, and the stockholder had a right to file it. In other words, the answer concedes what the demurrer denies.

The defendant may not answer and demur also to the same part of the bill. If he demur to a part, and answer to the same part, both cannot stand; the demurrer in such case is overruled by the answer. (*Barbay's Appeal*, 119 Pa. St. 413; 6 Ency. of Pl. & Pr. p. 414). We are inclined to the opinion, that the answer of the Glucose Sugar Refining Company overrules its demurrer in one or more of the respects above referred to.

But whether this is so or not, the Glucose Sugar Refining Company was a purchaser of the property *pendente lite*. Counsel for the Glucose Sugar Refining Company claim that there was a sale of this property to it. It is doubtful, under the evidence, whether there was any sale at all. The deed by the American Glucose Company was made to Johnson, but he swears that it was never delivered to him, and that he never purchased the property. The deed by the American Glucose Company was not made to the Glucose Sugar Refining Company, but was made to Johnson, and a deed is alleged to have been made by him to the Glucose Sugar Refining Company. Johnson received no purchase money, and when he signed the deed, was not aware of the character of the instrument he was signing. The deed made to him, and the deed made by him, were made after this bill was filed,

and after summons was served upon the American Glucose Company. *Lis pendens* begins from the service of the summons or subpœna after the filing of the bill. (*Grant v. Bennett,* 96 Ill. 513). "A purchaser from the defendant while the suit is pending acquires his interest subject to such decree as may be rendered on the hearing." (*Norris v. Ile,* 152 Ill. 190). In *Norris* v. *Ile, supra,* we said (p. 205): "Where there is a purchase *pendente lite,* not only is the purchaser bound by the decree that may be made against the person from whom he derives the title, but the litigating parties are exempted from taking any notice of the title so acquired; and such purchaser need not be made a party to the suit. He is not a necessary party, because his vendor or grantor continues as the representative of his interests, and the plaintiff or complainant may ignore his purchase, and proceed to final decree against the original parties."

Here, the American Glucose Company, and the officers and directors thereof, and the majority of stockholders, withdrew their answers, and submitted to a default; and a decree, confessing all the allegations of the bill, was entered against them. That decree is binding upon the Glucose Sugar Refining Company as a purchaser *pendente lite.* As a decree *pro confesso* was entered against the American Glucose Company, finding such allegations of the bill to be true, as justify the setting aside of the sale of its property, the Glucose Sugar Refining Company, which claims to derive title from the American Glucose Company, is bound by this decree against the latter company.

The decree *pro confesso* is sustained by the testimony in the record. Wilson, counsel for the Glucose Sugar Refining Company, was present at the taking of all the testimony on the part of the complainants below, and cross-examined the witnesses. The interests of the American Glucose Company, and its officers and directors, were one with those of the Glucose Sugar Refining Company.

According to the showing made by this record, as soon as the answers of the former were withdrawn, their counsel at once entered their appearance as solicitors of the latter.

It is true, that counsel for the Glucose Sugar Refining Company refused to allow witnesses to testify upon many material and important matters.  Many of these witnesses say, that they declined to answer, simply because Wilson objected to the questions.  Two of the counsel in this case refused to answer questions when they were upon the stand as witnesses.  As we understand the record, the refusal to answer was not placed upon the ground, that the witnesses would thereby criminate themselves, as showing their violation of the laws of the State against trusts and combines.  Their privilege in this regard was not claimed.  Nor did the main counsel, when testifying, base the refusal to answer upon the ground that to do so would be to divulge privileged communications.  These witnesses were forbidden to answer merely upon the alleged ground that the questions addressed to them called for immaterial testimony.  This is no reason why a witness should refuse to answer, where, in the question, no self-crimination or privileged communication is involved.  Therefore, the constant objections and refusals to answer, which appear all through this record, amount to an actual obstruction of the administration of justice.  The fact of such refusal is to be considered against the defendants, the same as any other refusal to produce evidence, which is within the power of a witness.  Such refusal to answer is competent evidence against the witness.  (*Andrews* v. *Freie*, 104 Mass. 234; 29 Am. & Eng. Ency. of Law, p. 846).

But notwithstanding the difficulties thrown in the way of eliciting evidence by these objections and refusals to answer, the record contains sufficient testimony to set aside the transfer made of the property of the American Glucose Company, as the same is above detailed.

Many points are made by counsel for Joseph Firmenich and George Firmenich in their arguments in support of their demurrer to the bill. But, in view of the disposition of the case so far as the Firmenichs are concerned, which is hereinafter made, it is unnecessary to notice these points. Allegations of the bill which concern the Firmenichs are few and meagre. Counsel for plaintiffs in error consents in his brief, that the bill may be dismissed as to the Firmenichs.

So far as the Illinois Trust and Savings Bank is concerned, it claims to have no interest in the transaction, except as a repository, and holder in escrow of the papers of all the parties concerned.

Therefore, we are inclined to think, that whatever error the circuit court committed in sustaining the demurrer of the Firmenichs and of the bank is not sufficient to justify a reversal and remandment of the cause for the purpose of allowing them to answer the bill.

The decree of the court below, dismissing the bill, is reversed, and the cause is remanded to the circuit court of Peoria county, with instructions to dismiss the bill as to Joseph Firmenich and George Firmenich, and the Illinois Trust and Savings Bank, and to enter a decree, setting aside the deed of the American Glucose Company to Edwin L. Johnson, and the deed executed by Edwin L. Johnson to the Glucose Sugar Refining Company, and all the contracts, assignments, and other instruments, accompanying the delivery of those deeds, so far as the American Glucose Company and its directors and officers and stockholders are concerned, and to grant such other and further relief as is consistent with the prayer of the bill, and as is sustained by the evidence already in the record.    *Reversed and remanded with directions.*